# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE EARTH     )
1101 15th Street, N.W.      )
Washington, D.C. 20005,     )
             )  Civ No.
LUKAS ROSS, PROGRAM MANAGER, )
Climate and Energy Program,    )
Friends of the Earth,       )
1101 15th Street, N.W.      )
Washington, D.C. 20005     )
             )
     Plaintiff,    )
             )
v.             )
             )
UNITED STATES DEPARTMENT OF  )
THE TREASURY,       )
1500 Pennsylvania Ave. N.W.,    )
Washington, D.C. 20220,     )
             )
     Defendant.   )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552,

to compel the United States Department of Treasury ("Treasury Department") to release non-

exempt information concerning its implementation of the COVID-19 relief programs established

under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. 116-136 (2020),

and how that implementation may be influenced by special interests. This information is essential

to efforts by Plaintiff Friends of the Earth ("FOE") to monitor and educate the public regarding the

Treasury Department's use of funds and authorities that Congress intended to broadly sustain the

American economy against severe impacts from a global pandemic. The information is also

essential to evaluating whether the Treasury Department's implementation of the CARES Act is

1

consistent with Congressional intent or is instead unduly influenced by special interests, as well as the degree to which further congressional action may be necessary to ensure that federal funds are properly allocated. The records sought in this case would promote transparency and shed light on the actions of the Treasury Department related to the use of taxpayer dollars to support a dangerous, polluting industry.

2.      Plaintiff FOE submitted a FOIA request to the Department of Treasury on June 4, 2020. *See* Exhibit 1. Plaintiff FOE requested expedited processing of this FOIA request and submitted a sworn declaration in support, explaining in detail that expedited processing is necessary due to the urgency to inform the public about how the Treasury Department is implementing the CARES Act. *See* Exhibit 2. For example, Plaintiff's sworn declaration explained that FOE provides the public and members of Congress with information about how special interests lobby the Treasury Department. This declaration also noted that congressional staffers have informed FOE that this information is highly relevant and useful to congressional efforts to improve oversight of the implementation of the CARES Act. Plaintiff's declaration further explained that expedited processing was necessary because Congress is currently considering proposals for further legislation to provide additional relief for the economic impacts from COVID-19, and because the information sought in FOE's FOIA request will become substantially less useful if the Treasury Department delays its release until after Congress has acted or after the Treasury Department itself has made final decisions regarding the appropriation of federal funds.

3.      On June 8, 2020, the Treasury Department acknowledged receipt of FOE's FOIA request, but denied FOE's request for expedited processing. *See* Exhibit 3. Without addressing any of the information FOE provided in its FOIA request or the accompanying declaration—or even acknowledging the existence of FOE's sworn declaration or the evidence contained therein—the

Treasury Department asserted that FOE had "not provided any evidence . . . that there is an urgency to inform the public about an actual or alleged government activity."

4.     Although FOIA's statutory deadline for responding to FOE's FOIA request has elapsed, the Treasury Department has not released any responsive information, or even indicated what—if any—information the Department intends to release and on what time frame.

## JURISDICTION

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B).

## PARTIES

6.     Plaintiff FOE is a non-profit organization headquartered in Washington, D.C. For more than fifty years, it has championed the causes of a clean and sustainable environment, protection of the nation's public lands and waterways, and the exposure of political malfeasance and corporate greed. FOE is the requester of the records at issue.

7.     Plaintiff Lukas Ross is the Program Manager for the Climate and Energy Program at FOE. Mr. Lukas submitted the FOIA request at issue as part of his duties at FOE.

8.     Defendant United States Department of the Treasury is partially responsible for the implementation of the CARES Act and is a federal agency in possession of the information at issue. The Treasury Department is responsible for the actions and omissions challenged herein.

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS

### A.     The CARES Act

9.     Congress passed the CARES Act by overwhelming, bipartisan majorities in both chambers, including 419 Representatives and 96 Senators in favor, and the President signed the CARES Act into law on March 27, 2020.

10.     The CARES Act provides over $2 trillion in various forms of immediate economic relief, making it one of the largest direct economic interventions by Congress in the history of the United States.

11.     Title IV of the CARES Act, titled "Economic Stabilization and Assistance to Severely Distressed Sectors of the United States Economy," has the short title of the "Coronavirus Economic Stabilization Act of 2020." CARES Act § 4001. This provision authorizes the Treasury Department, through the Secretary of the Treasury, to provide subsidies for "eligible businesses" in the form of "loans, loan guarantees, and other investments" of up to $500 billion. *Id.* § 4003. An "eligible business" is defined to include any "United States business that has not otherwise received adequate economic relief in the form of loans or loan guarantees" through other provisions of the CARES Act. *Id.* § 4002.

12.     Title IV of the CARES Act vests the Treasury Department with broad discretion over the allocation of hundreds of billions of dollars of federal funds. For example, any "loan, loan guarantee, or other investment by the Secretary [of the Treasury]" may include "such terms and conditions . . . as the Secretary determines appropriate." CARES Act § 4003(c). Likewise, although the CARES Act required the Treasury Department to promptly publish "procedures for applications and minimum requirements" for receiving federal funds, the Act provided the Department broad discretion over the substance of those procedures and requirements, allowing the Department to supplement any such procedures and requirements "in the Secretary's discretion." *Id.*

13.     Title IV of the CARES Act specifies that $454 billion—the largest portion of the total amount authorized under that Title—"shall be available to make loans and loan guarantees,

and other investments" to "provid[e] liquidity to the financial system that supports lending to eligible businesses, States, or municipalities." CARES Act § 4003(b).

14.     Title IV of the CARES Act also removed some of the transparency and oversight that is typically required for federal agency operations. By providing "Temporary Government in the Sunshine Act Relief," the CARES Act allowed the Board of the Federal Reserve to suspend the requirements of the Government in the Sunshine Act, 5 U.S.C. § 552b, during the coronavirus crisis. As a result, the Federal Reserve Board may elect to conduct meetings that are no longer "open to public observation," *id.* § 552b(b). *See* CARES Act § 4009.

15.     Congress specified that the authority provided under Title IV of the CARES Act "to make new loans, loan guarantees, or other investments shall terminate" on December 31, 2020. CARES Act § 4029.

**B.     The Treasury Department's Controversial and Secretive Implementation of the CARES Act**

16.     The implementation of the CARES Act has been fraught with controversy, and the Trump Administration and the Treasury Department have resisted oversight by Congress and the public.

17.     For example, the Brookings Institution recently released a report entitled "Addressing the other COVID crisis: Corruption," which highlights "[t]he need for oversight of Trump administration coronavirus spending." This report notes that: "27 clients of Trump-connected lobbyists have received up to $10.5 billion" of CARES Act funds; that "beneficiaries have also included multiple entities linked to the family of Jared Kushner and other Trump associates and political allies"; "that up to $273 million was awarded to more than 100 companies

that are owned or operated by major donors to Trump's election efforts"; "and that many other transactions meriting further investigation have occurred."[1]

18.     Notably, as the Brookings Institution report describes, these questionable appropriations "come[] in a climate of Trump Administration hostility to oversight." For example, "[d]uring negotiation on the CARES Act, the president claimed that he personally would 'be the oversight,'" and included a signing statement on the CARES Act that refuses to treat as mandatory a congressional requirement for reporting to inspectors general. Likewise, the Treasury Department has resisted calls to provide information on how it is implementing the CARES Act, initially refusing to identify recipients of certain funds and "only relent[ing] in the face of crushing public and congressional pressure."

19.     As recently reported in The Hill, the "three independent oversight panels set up by Congress in the bipartisan CARES Act almost four months ago have all encountered serious obstacles." These obstacles have "raised concerns about whether lawmakers have enough information about the programs they already passed as they head into negotiations over another coronavirus relief package."[2]

20.     Congress is currently considering further legislative action to provide relief from economic harms associated with the coronavirus, as well as to provide greater oversight of the administration of appropriated funds.

---

[1] The Brookings Institution report is available at https://www.brookings.edu/research/addressing-the-other-covid-crisis-corruption/. This report is also attached as Exhibit 4.

[2] *See* Alexander Bolton, *Battle brewing on coronavirus relief oversight*, THE HILL, (July 15, 2020), *available at* https://thehill.com/homenews/senate/507380-battle-brewing-on-coronavirus-relief-oversight. This article is also attached as Exhibit 5.

C.     **The Freedom of Information Act**

21.     "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citations omitted). FOIA was enacted to "permit access to official information long shielded unnecessarily from public view" by creating a "right to secure such information from possibly unwilling official hands." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). "[D]isclosure, not secrecy, is the dominant objective of the Act." *John Doe*, 493 U.S. at 152 (citation omitted).

22.     FOIA requires agencies of the federal government to conduct a reasonable search for requested records and to release them to a requester, unless one of nine specific statutory exemptions applies to the requested information. 5 U.S.C. § 552(a)(3), (b).

23.     FOIA requires federal agencies to release all non-exempt segregable information that is requested. *Id.* § 552(b).

24.     FOIA allows requesters to seek expedited processing of requests "in cases in which the person requesting the record demonstrates a compelling need." 5 U.S.C. § 552(a)(6)(E). An agency must determine whether or not to grant a request for expedited processing "within 10 days after the date of the request." *Id.* § 552(a)(6)(E)(ii)(I). "Agency action to deny . . . a request for expedited processing . . . shall be subject to judicial review." *Id.* § 552(a)(6)(E)(iii). An agency must provide some reasonable explanation for the denial of a request for expedited processing. *See*, *e.g.*, *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, --- F. Supp. 3d ---, 2020 WL 515884 (D.D.C. Jan. 31, 2020) (finding that where an agency "provided no explanation

for its flat assertion" that a requester had not met the standards for expedited processing, the agency's rejection of expedited processing "does not stand up to judicial review").

25.     The Treasury Department's regulations implementing FOIA specify that requests "will be processed on an expedited basis" when they involve "[a]n urgency to inform the public about an actual or alleged Federal government activity, if made by a person who is primarily engaged in disseminating information." 31 C.F.R. § 1.4(e)(1)(ii). The Treasury Department requires a requester seeking expedited processing to "submit a statement, certified to be true and correct, explaining in detail the basis for making the request for expedited processing." *Id.* § 1.4(e)(3). The Treasury Department specifies that "[t]he standard of 'urgency to inform' requires that the records requested pertain to a matter of current exigency to the public and that delaying a response to a request for records would compromise a significant recognized interest to and throughout the general public." *Id.* § 1.4(e)(1)(ii)

26.     Even if expedited processing is not granted, upon receiving a FOIA request, an agency generally has twenty working days to respond, *id.* § 552(a)(6)(A)(i).

27.     In "unusual circumstances," an agency may extend FOIA's standard deadline by an additional ten working days and, in these circumstances, must specify "the date on which a determination is expected to be dispatched." 5 U.S.C. § 552(a)(6)(B)(i).

28.     A requester has exhausted administrative remedies "if the agency fails to comply" with FOIA's statutory deadlines. *Id.* § 552(a)(6)(C)(i). In that event, FOIA authorizes the requester to invoke the jurisdiction of a federal court to obtain the requested information.  *Id.* § 552(a)(4)(B).

**D.**   **Friends of the Earth's FOIA Request**

29.     Plaintiff FOE has serious concerns that the Treasury Department's implementation of the CARES Act may be subject to undue influence by special interests, especially by fossil fuel industries.

30.     Demonstrating this concern, FOE has published and disseminated fact sheets and reports highlighting fossil fuel industry lobbying over the CARES Act. One such report, entitled "Cashing in on COVID: Tax Breaks, Royalties and Stimulus Loans," highlights the fact that "[t]he three main trade associations of the oil and gas industry . . . all reported lobbying directly around tax issues in the CARES Act," and that that some of the largest drilling and refining companies have reported lobbying on similar issues.[3]

31.     Another FOE report, entitled "The Big Oil Money Pit: How $750 billion in new stimulus spending could prop up failing polluters," explains that due in part to the Treasury Department's broad discretion over the implementation of the CARES Act, "[t]here are strong indications that as these programs are deployed, they will function as a bailout for the fossil fuel industry." One danger that this report underscores is that due to the fact that "[t]he Treasury and the Fed already have broad discretion over the implementation of the stimulus . . . the Fed and Treasury could . . . [f]urther loosen standards to support junk-rated companies, including fracking companies not currently eligible for aid."[4]

---

[3] *See* Lukas Ross, Senior Policy Analyst, Friends of the Earth, *Cashing in on COVID: Tax Breaks, Royalties and Stimulus Loans*, *available at* https://1bps6437gg8c169i0y1drtgz-wpengine.netdna-ssl.com/wp-content/uploads/2020/05/CashingInOnCOVID-4.pdf. This report is also attached as Exhibit 6.

[4] *See* Lukas Ross, Senior Policy Analyst, Friends of the Earth, *The Big Oil Money Pit: How $750 billion in new stimulus spending could prop up failing polluters*, *available at* https://1bps6437gg8c169i0y1drtgz-wpengine.netdna-ssl.com/wp-content/uploads/2020/04/Big-Oils-Lifeline.pdf. This report is also attached as Exhibit 7.

32.    Exacerbating these concerns, FOE recently obtained information through a separate FOIA request to the Treasury Department's Office of the Comptroller of Currency that revealed that the fossil fuel industry is in fact lobbying the Treasury Department to loosen bank guidelines so that currently ineligible members of that industry could obtain federal subsidies. As it routinely does, FOE disseminated this information broadly to the public, leading to an article in the Washington Post explaining that "[o]il and gas companies are putting pressure on the Trump administration to loosen bank guidelines put in place under President Barack Obama so they [can] better access emergency loans during the coronavirus pandemic."[5]

33.    Concerned that the Treasury Department's implementation of the CARES Act may be subject to undue influence from special interests associated with fossil fuel industries, FOE submitted a FOIA request to the Treasury Department on June 4, 2020. FOE's FOIA request sought "information regarding specific interactions, meetings, communications, and relationships between the U.S. Department of the Treasury—including the Office of the Secretary, Office of the Deputy Secretary, and Counselor to the Secretary, as well as any individual officers or employees within those offices or contractors employed by those offices—and the specific entities listed" in the request:

> • **Employees or agents of the American Petroleum Institute:** Stephen Comstock, Kenneth Moy, William Koetzle, William Hupman III, and any other persons using the domain @api.org.

---

[5] Dino Grandoni, *The Energy 202: Oil industry lobbies to relax bank lending guidelines due to pandemic*, WASH. POST (Jan. 26, 2020), *available at* https://www.washingtonpost.com/news/powerpost/paloma/the-energy-202/2020/06/26/the-energy-202-oil-industry-lobbies-to-relax-bank-lending-guidelines-due-to-pandemic/5ef4f781602ff1080718f34e/. This article is also attached as Exhibit 8.

• **Employees or agents of the Independent Petroleum Association of America:** Barry Russell, Lee Fuller, Dan Naatz, Ryan Ullman, Mallori Miller and any other persons using domain @ipaa.org.

• **Employees or agents of ExxonMobil:** Ed Coleman, Daniel Easley, Jane [Elise] Maraist Jones, Jennifer Linker, Keith McCoy, Jeanne Mitchell, Gantt Walton, and any other persons using the domain @exxonmobil.com.

• **Employees or agents of Blank Rome Government Relations:** David Thompon, Joseph McMonigle, and any other persons using the domain @blankrome.com.

• **Employees or agents of Phillips 66:** Richard Guerard and any other persons using the domain @p66.com.

• **Employees or agents of QEP:** Shane Schultz, and any other persons using the domain @qepres.com.

• **Employees or agents of the asset manager BlackRock:** Barbara Novick, Kathryn Fulton, Joanne Medero, Thomas Clark, Samantha DeZur, and any other persons using the domain @blackrock.com.

• **Employees or agents of Thomas Coburn LLP:** Charles Kyle Simpson, Jack N. Jacobson, Kenneth D. Salomon and any other persons using the domain @thomascoburn.com.

• **Employees or agents of Goldman Sachs:** Kenneth Connolly, Michael Paese, Michael Thompson, Joe Wall, Amy Hunt, Joyce Brayboy, Stephen Pastrick, Ryan Jachym, and any other persons using additional communications ending in the domain @gs.com

• **Employees or agents of Morgan Stanley:** Thomas McCrocklin, Michael Stein, David Kemps, and any other persons using emails ending in the domain @morganstanley.com.

• **Employees or agents of FTI Government Consulting**: Robert Moran, Emily Haas, and any other persons using the domain @fticonsulting.com.

• **Employees or agents of Crossroads Strategies**: Todd M. Weiss, Mathew Lapinski, Hunter Moorhead, Jason Van Pelt, Wally Burnett, Katherine Dapper, Jason Gleason, Chris Miller, Salim Alameddin, Rontel Batie, Alex Gleason, and any other persons using the domain @crshq.com

• **Employees or agents of Bank of America:** Edward Hill, Darrell Minott, James Carlisle, Spencer Taube and any other persons using emails emails sent from the domain @bankofamerica.com.

• **Employees or agents of Citigroup Washington, inc:** Candida Wolff, William Rys, and any other persons using the emails originating from a domain ending in @citi.com

• **Employees or agents of Cypress Advocacy:** Brant Imperatore, William Mueller, Chris Brown and any other persons using any emails sent from the domain @cypressgroupdc.com.

**Employees or agents of Mehlman, Castagnetti, Rosen and Thomas, INC**: David Castagnetti, David Thomas, Sage Eastman, Constantine Hingson, Paul Thornell, and any other persons using the domain @mc-dc.com.

• **Employees or agents of Wells Fargo**: Sanders Adu, Daniel Archer, Julie Slocum, David Moskowitz, John Hand, Meghan Sullivan, Beth Zorc, and any other persons using emails sent from the domain ending in @wellsfargo.com

• **Employees or agents of JP Morgan Chase**: Timothy Berry, Head of Global Government Relations; Jason Rosenberg; Managing Director; Michelle Mesack, Hilary West, Alyssa Marois, Shannon Boozman, Elizabeth Herman, John Van Etten, and any other persons using emails ending in the domain @jpmorgan.com.

34.    FOE's FOIA request also specified that as to the requested information, FOE sought "[r]ecords of communications between the U.S. Department of Treasury and any of the above-listed entities, from February 24, 2020 to present, including any emails or facsimiles," as well as "[r]ecords of any meetings held, including minutes of those meetings, any presentation materials, including powerpoints, handouts, reference materials, meeting notes, and a full list of attendees, including personnel from the U.S. Department of Treasury and other federal and state agencies, any of the above-listed entities, and any other stakeholders."

35.    FOE's FOIA request included a well-substantiated request for a fee waiver, offering a detailed explanation as to why the disclosure of the requested information is "in the public interest because it is likely to contribute significantly to the public understanding of the operation or activities of the government and is not primarily in the commercial interest of the requester." 5

12

U.S.C. § 552(a)(4)(A)(iii). For example, FOE explained that it is a non-profit organization with no commercial interest in the requested information, and that the requested information would be "meaningfully informative as to the types of communications between the U.S. Department of Treasury officials and the above-listed entities, the types of requests that are being made, and whether/how those requests are being considered." Based on similar requests, FOE regularly obtains fee waivers from other federal agencies.

36.     FOE's FOIA request also explained that "the value of the requested information depends on its timely release," and offered to collaborate with the Treasury Department's FOIA officers on the proper processing of the FOIA request "to ensure that the most critical information is made available to the public in a manner and at a time that allows the information to be useful to Friends of the Earth, the public, and Congress in evaluating the Department of the Treasury's implementation of the CARES Act and whether further congressional action may be necessary."

37.     Likewise, because the value of the requested information depends on its timely release, FOE's FOIA request also included a detailed request for expedited processing supported by a sworn declaration. For example, FOE's FOIA request explained that "assessing how agencies are using and allocating those funds" provided as part of the CARES Act "and informing the public of how public relief funds are being allocated *before* they are distributed are undoubtedly 'urgent' matters." Likewise, the request explained that "delaying a response to this request would risk allowing U.S. Department of Treasury to oversee the disbursement of potentially trillions of dollars without any meaningful public input or scrutiny, thus 'compromis[ing] a significant recognized interest to and throughout the general public.'" (quoting 31 C.F.R. § 1.4(e)).

38.     In a sworn declaration accompanying the FOIA request, Lukas Ross, Program Manager for the Climate and Energy Program at FOE, provided additional detailed information in

support of FOE's request for expedited processing. For example, Mr. Ross, who signed the FOIA request at issue, explained that his "primary responsibility" in his role at FOE "is to scrutinize government activity that may impact human health and the environment, and to disseminate information on those activities to the public." Mr. Ross also explained that he has "personally published several fact sheets and reports highlighting the financial instability of key industry players and the risks presented by the unprecedented authority the CARES Act granted to the Treasury Department and the ways in which that authority could benefit Big Oil." Mr. Ross explained that he has "shared these fact sheets with members of Congress and their staff, FOE's members and supporters, and journalists, as well as with the general public" and that he has been informed by congressional staffers that the information he has provided "is both highly relevant and useful to efforts to improve congressional oversight of the implementation of the CARES Act, develop legislative proposals to address the shortcomings of the CARES Act, and educate constituents on the ongoing public debate regarding the use of public funds to subsidize the oil and gas industry."

39.     As Mr. Ross explained, "[i]f loan programs are designed in a way that grants the oil and gas industry unfair access, the CARES Act could become a vehicle for a *de facto* bailout to an industry that poses devastating environmental, socioeconomic, and public health impacts." Moreover, Mr. Ross highlighted the fact that the effort "to influence the Department's approval of CARES Act relief is happening in secret, behind closed doors, without any public input or scrutiny." Mr. Ross explained that "[t]he public has a significant interest in ensuring that public funds and programs that were intended to support small businesses, individuals, and families through a global health crisis are not redirected toward propping up the fossil fuel industry, which is financially risky and environmentally destructive."

40. Mr. Ross's declaration also explained that "FOE's FOIA request will provide information directly relevant to the ongoing public debate regarding the appropriate use of emergency funds and programs under the CARES Act to benefit the fossil fuel industry. . . ." He also attested that FOE's FOIA request "will allow FOE to quickly respond to industry lobbying efforts by disseminating information to its members, Congress, and the public at large to ensure that the U.S. Department of Treasury receives input from all stakeholders."

41. Mr. Ross also explained that "[a]ny delay in processing FOE's request will seriously compromise FOE's and the public's interests in meaningfully participating in debates over such important and pressing issues as the appropriate use of coronavirus relief funds," and that "any delay in the processing of FOE's request risks delivering information that is ultimately of limited utility." As Mr. Ross detailed, "once the Treasury Department approves relief and lending programs associated with COVID-19, the additional financial risk will already have been assumed and taxpayers will have been made liable." Likewise, Mr. Ross noted that "any delay in the processing of FOE's request would preclude FOE, the public, and Congress's access to information directly relevant to legislative proposals and negotiations regarding the curtailing of executive authority to use CARES Act funds and programs to benefit the fossil fuel industry, and to additional coronavirus relief packages." In sum, Mr. Ross offered a highly detailed explanation of why "FOE more than satisfies the requirements necessary to qualify for expedited processing."

42. On June 8, 2020, the Treasury Department sent FOE a letter acknowledging receipt of FOE's FOIA request and assigning it the tracking number 2020-06-047.

43. The Treasury Department's June 8, 2020 letter did not provide any determination regarding FOE's request for a fee waiver.

15

44.     The Treasury Department's June 8, 2020 letter denied FOE's request for expedited processing. Without addressing any of the detailed explanations provided in FOE's FOIA request or in Mr. Ross's declaration—and, in fact, totally ignoring the evidence supplied therein—the Treasury Department asserted that "[y]ou have not provided any evidence . . . that there is an urgency to inform the public about an actual or alleged government activity."

45.     The Treasury Department's letter also informed FOE that the agency would not comply with FOIA's requirement to provide a determination within twenty working days. Instead, the Treasury Department asserted that "unusual circumstances exist . . . due to the consultation required between two or more program offices and/or a search is expected to result in voluminous records and/or a search is required to be conducted for records stored in field offices or warehouses off site." The Treasury Department thus asserted that "an additional processing extension of (10) days is required to process your request."

46.     Although FOIA explicitly requires that agencies claiming an extension of deadlines due to "unusual circumstances" must inform the requester of "the date on which a determination is expected to be dispatched," 5 U.S.C. § 552(a)(6)(B)(i), the Treasury Department failed to provide any such information.

47.     More than 30 working days have passed since the Treasury Department confirmed receipt of FOE's FOIA request. In that time, FOE has not received any communication from the Treasury Department regarding this request.

48.     The Treasury Department has not released any information responsive to FOE's FOIA request, nor made any determination as to what information will be produced and what information will be withheld.

## PLAINTIFF'S CLAIMS FOR RELIEF

49.     By failing to provide FOE all non-exempt information that Plaintiff FOE has requested under FOIA, the Treasury Department is in violation of FOIA, 5 U.S.C. § 552(a)(3).

50.     By denying FOE's request for expedited processing of its FOIA request, the Treasury Department is in violation of FOIA, 5 U.S.C. § 552(a)(6)(E)(iii).

51.     By failing to provide any explanation for its denial of FOE's request for expedited processing of its FOIA request, the Treasury Department is in violation of FOIA, 5 U.S.C. § 552(a)(6)(E)(iii).

52.     By failing to grant FOE's request for a fee waiver, the Treasury Department is in violation of FOIA, 5 U.S.C. § 552(a)(4)(A)(iii).

53.     Plaintiff FOE has a right to obtain the requested information, and the Treasury Department has no lawful basis for withholding it.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1.     Declare that the Treasury Department is in violation of FOIA;

2.     Enjoin the agency from withholding responsive information and order Defendant to immediately release to Plaintiff all non-exempt information responsive to Plaintiff's FOIA request at issue in this case;

3.     Award Plaintiff its costs and attorneys' fees; and

4.     Award Plaintiff such other and further relief as the Court may deem just and proper.


Respectfully submitted,

/s/ William N. Lawton
DC Bar No. 1046604

17

nick@eubankslegal.com

/s/ Elizabeth L. Lewis
D.C. Bar No. 229702
lizzie@eubankslegal.com

/s/ William S. Eubanks II
D.C. Bar No. 987036
bill@eubankslegal.com

Eubanks & Associates LLC
1331 H Street NW, Suite 902
Washington, DC 20005
(202) 556-1243

## Exhibit List

Exhibit 1:     Friends of the Earth's June 4, 2020 FOIA Request

Exhibit 2:     Declaration of Lukas Ross, attached to June 4, 2020 FOIA Request

Exhibit 3:     Acknowledgment Letter from U.S. Department of Treasury

Exhibit 4:     Brookings Institution report: *Addressing the other COVID crisis: Corruption*

Exhibit 5:     Alexander Bolton, *Battle brewing on coronavirus relief oversight*, The Hill, (July 15, 2020)

Exhibit 6:     Friends of the Earth report, *Cashing in on COVID: Tax Breaks, Royalties and Stimulus Loans*

Exhibit 7:     Friends of the Earth report, *The Big Oil Money Pit: How $750 billion in new stimulus spending could prop up failing polluters*

Exhibit 8:     Dino Grandoni, *The Energy 202: Oil industry lobbies to relax bank lending guidelines due to pandemic*, Wash. Post (Jan. 26, 2020)

Exhibit 1:      Friends of the Earth's June 4, 2020 FOIA Request



*Submitted via email and facsimile.*
**EXPEDITED PROCESSING REQUESTED**

June 4, 2020

Steven Terner Mnuchin
Secretary of the Treasury
U.S. Department of the Treasury

Justin Muzinich
Deputy Secretary of the Treasury
U.S. Department of the Treasury

Daniel Kowalski
Counselor to the Secretary
U.S. Department of the Treasury

**Re: Freedom of Information Act Request for Communications Between Identified Parties and the U.S. Department of the Treasury**

Dear FOIA Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Friends of the Earth requests information concerning the Department of the Treasury's implementation of the COVID-19 relief programs established under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, and how that implementation may be influenced by special interests. Specifically, Friends of the Earth requests information regarding specific interactions, meetings, communications, and relationships between the U.S. Department of the Treasury—including the Office of the Secretary, Office of the Deputy Secretary, and Counselor to the Secretary, as well as any individual officers or employees within those offices or contractors employed by those offices—and the specific entities listed below:

- **Employees or agents of the American Petroleum Institute:** Stephen Comstock, Kenneth Moy, William Koetzle, William Hupman III, and any other persons using the domain @api.org.

- **Employees or agents of the Independent Petroleum Association of America:** Barry Russell, Lee Fuller, Dan Naatz, Ryan Ullman, Mallori Miller and any other persons using domain @ipaa.org.

- **Employees or agents of ExxonMobil:** Ed Coleman, Daniel Easley, Jane [Elise] Maraist Jones, Jennifer Linker, Keith McCoy, Jeanne Mitchell, Gantt Walton, and any other persons using the domain@exxonmobil.com.

1



- **Employees or agents of Blank Rome Government Relations:** David Thompon, Joseph McMonigle, and any other persons using the domain @blankrome.com.

- **Employees or agents of Phillips 66:** Richard Guerard and any other persons using the domain @p66.com.

- **Employees or agents of QEP:** Shane Schultz, and any other persons using the domain @qepres.com.

- **Employees or agents of the asset manager BlackRock:** Barbara Novick, Kathryn Fulton, Joanne Medero, Thomas Clark, Samantha DeZur, and any other persons using the domain @blackrock.com.

- **Employees or agents of Thomas Coburn LLP:**Charles Kyle Simpson, Jack N. Jacobson, Kenneth D. Salomon and any other persons using the domain @thomascoburn.com.

- **Employees or agents of Goldman Sachs:** Kenneth Connolly, Michael Paese, Michael Thompson, Joe Wall, Amy Hunt, Joyce Brayboy, Stephen Pastrick, Ryan Jachym, and any other persons using additional communications ending in the domain @gs.com

- **Employees or agents of Morgan Stanley:** Thomas McCrocklin, Michael Stein, David Kemps, and any other persons using emails ending in the domain @morganstanley.com.

- **Employees or agents of FTI Government Consulting**: Robert Moran, Emily Haas, and any other persons using the domain @fticonsulting.com.

- **Employees or agents of Crossroads Strategies**: Todd M. Weiss, Mathew Lapinski, Hunter Moorhead, Jason Van Pelt, Wally Burnett, Katherine Dapper, Jason Gleason, Chris Miller, Salim Alameddin, Rontel Batie, Alex Gleason, and any other persons using the domain @crshq.com

- **Employees or agents of Bank of America:** Edward Hill, Darrell Minott, James Carlisle, Spencer Taube and any other persons using emails emails sent from the domain @bankofamerica.com.

- **Employees or agents of Citigroup Washington, inc:** Candida Wolff, William Rys, and any other persons using the emails originating from a domain ending in @citi.com

- **Employees or agents of Cypress Advocacy:** Brant Imperatore, William Mueller, Chris Brown and any other persons using any emails sent from the domain @cypressgroupdc.com.

2



- **Employees or agents of Mehlman, Castagnetti, Rosen and Thomas, INC**: David Castagnetti, David Thomas, Sage Eastman, Constantine Hingson, Paul Thornell, and any other persons using the domain @mc-dc.com.

- **Employees or agents of Wells Fargo**: Sanders Adu, Daniel Archer, Julie Slocum, David Moskowitz, John Hand, Meghan Sullivan, Beth Zorc, and any other persons using emails sent from the domain ending in @wellsfargo.com

- **Employees or agents of JP Morgan Chase**: Timothy Berry, Head of Global Government Relations; Jason Rosenberg; Managing Director; Michelle Mesack, Hilary West, Alyssa Marois, Shannon Boozman, Elizabeth Herman, John Van Etten, and any other persons using emails ending in the domain @jpmorgan.com.

With regard to the information requested herein, Friends of the Earth specifically seeks the following:

- Records of communications between the U.S. Department of Treasury and any of the above-listed entities, from February 24, 2020 to present, including any emails or facsimiles.

- Records of meetings held, including minutes of those meetings, any presentation materials including powerpoints, handouts, reference materials, meeting notes, and a full list of attendees, including personnel from the U.S. Department of Treasury and other federal and state agencies, any of the above-listed entities, and any other stakeholders.

Friends of the Earth would be happy to collaborate with the Treasury Department's FOIA officers on the selection of search terms and identification of custodians to aid in the Department's efforts to resolve this request in an efficient and mutually beneficial manner. Additionally, because the value of the requested information depends on its timely release, as discussed further below, Friends of the Earth also requests the opportunity to discuss the order in which the agency reviews and releases information, to ensure that the most critical information is made available to the public in a manner and at a time that allows the information to be useful to Friends of the Earth, the public, and Congress in evaluating the Department of the Treasury's implementation of the CARES Act and whether further congressional action may be necessary.

For this request, the term "records" refers to, but is not limited to, correspondence of any kind, memoranda, letters, notes, schedules, electronic mail, telephone logs, minutes of meetings, peer review comments, work papers, reports, studies, and/or data, as well as any other information regarding the foregoing types of records.

The FOIA provides that if portions of a document are exempt from release, the remainder must nevertheless be segregated and disclosed, so please provide us with all non-exempt portions of any exempt records. 5 U.S.C. § 552(b). Please explain any redactions by reference to specific

1101 15th Street, NW • 11th Floor • Washington, DC 20005 • (202) 783-7400 • www.foe.org
2150 Allston Way • Suite 360 • Berkeley, CA 94704 • (510) 900-3150



provisions of the FOIA that allow information to be exempt from disclosure, and specifically explain how the exemption invoked applies to the withheld information. *See* 31 C.F.R. § 1.4(i).

**Fee Waiver Request:**  As a non-profit organization, Friends of the Earth also requests a waiver of all fees incurred in providing these records. Disclosure of the requested information "is in the public interest because it is likely to contribute significantly to the public understanding of the operation or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A) (iii)); 31 C.F.R. § 1.7(k) ("A component must furnish records responsive to a request without charge or at a reduced rate when it determines, based on all available information, that disclosure of the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.").

Disclosure of the requested records is "likely to contribute significantly to public understanding of [federal government] operations or activities" that affect their safety, health, and environment. 31 C.F.R. § 1.7(k)(2)(ii). Friends of the Earth has over 1.7 million members and activists across the United States who place a priority on ensuring that the federal government takes proper considerations for the impacts of its actions on the environment and public health. This starts with knowing what the government is doing, who they are in communications with, and what is being asked of policymakers.

This records request concerns identifiable operations and activities of the federal government and will be meaningfully informative as to those operations and activities. We have reason to suspect that U.S. Department of Treasury is currently being lobbied by certain entities around key issues related to coronavirus response and relief, including the design of lending programs under Title IV of the Coronavirus Aid, Relief, and Economic Security (CARES) Act. These lending powers entrust massive power to the Treasury Department and if used improperly could function as a *de facto* bailout to an industry that poses devastating environmental, socio-economic, and public health impacts.

The records requested herein will be meaningfully informative as to the types of communications between U.S. Department of Treasury officials and the above-listed entities, the types of requests that are being made, and whether/how those requests are being considered. The records may also shed light on the U.S. Department of Treasury's support of fossil fuel extraction in the U.S., as well as what – if any – processes the federal government has undertaken to protect communities and the stability of our financial system from this industry.

The requested records are likely to contribute significantly to the broader public's increased understanding of government operations and activities. Through these records, Friends of the Earth expects to significantly increase the public's understanding of whether the fossil fuel and financial sectors continue to receive COVID-19 related federal monetary benefits. A broad sector of the public is concerned that the federal government is legitimizing and supporting fossil fuel extraction despite the array of harms that this industry poses on the ecosystem and public health. The public

4



is always well-served when it knows how the government conducts its activities, particularly matters touching on important questions about how agencies are implementing their statutory duties or about how Congress should enact further legislation to ensure that agencies are complying with congressional intent. Hence, there can be no dispute that disclosure of the requested records to the public will significantly contribute to educating the public about U.S. Department of Treasury operations, activities, and decisionmaking. We will utilize the released records and our organizational expertise to help our members, activists, the general public, and the media to increase their understanding of these important issues.

Friends of the Earth has a demonstrated "expertise in the subject area [of fossil fuel extraction] as well as the . . . ability and intention to effectively convey information to the public." 31 C.F.R. § 1.7(k)(2)(ii)(B). To that end, we utilize various means of communication to update our members and activists, as well as the media and general public, on government activities that may impact human health and the environment. These methods include, but certainly are not limited to, providing essential information in easy-to-read reports, a quarterly news magazine, fact sheets, press statements, public hearings and events, phone calls, letters to the editor, blogs, email alerts, and webpage updates.[1] Specifically for this request, Friends of the Earth plans to alert its members and activists as to recent government meetings and activities undertaken as part of federal programs that legitimize and support fossil fuel extraction, especially amid the COVID-19 pandemic.

Friends of the Earth is a not-for-profit charitable organization with no commercial interest in or use for the information requested, as defined in 31 C.F.R. § 1.7(b)(1). *See also id.* at § 1.7(k)(2)(iii). There is no "existence" or "magnitude" to any commercial interest associated with this request, and our "primary interest in disclosure" is simply to benefit the public interest by informing the public and other members of the media as to government activities. *Id.* at § 1.7(k)(2)(iii). Our main purpose in requesting the documents is to increase public knowledge and participation in the government process so fundamental to the effective working of a democracy.[2]

---

[1] See, e.g., Friends of the Earth US, *The Big Oil Money Pit: How 750 billion in new stimulus spending could pro up failing polluters* (last visited May 18, 2020), https://1bps6437gg8c169i0y1drtgz-wpengine.netdna-ssl.com/wp-content/uploads/2020/04/Big-Oils-Lifeline.pdf. Friends of the Earth US. *Cashing in on COVID: Tax Breaks, Royalties and Stimulus Loans* (last visited May 18, 2020), http://foe.org/wp-content/uploads/2020/05/CashingInOnCOVID-4.pdf

[2] Friends of the Earth also qualifies as a "representative of the news media," and is further entitled to document search and review without charge (as well as the first 100 pages of paper copies free of charge). *See* 31 C.F.R. § 1.7(b)(6) ("Representative of the news media is any person or entity that actively gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience."). Friends of the Earth "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience." *See* 5 U.S.C. § 552(a)(4)(A)(ii); *Nat'l Security Archive v. U.S. Dep't of Defense,* 800 F.2d 1381, 1387 (D.C. Cir. 1989). Friends of the Earth has extensive and well-exercised means to keep the public informed on the operations and activities of the federal government.  Friends of the Earth does not merely obtain information and then contact members of the press to relate that information; rather, we independently analyzes the information,

5



Because of the non-profit, public interest nature of Friends of the Earth, we have extremely limited financial resources with which to cover the copying and search expenses of this request. If our request for a fee waiver is denied and any expenses associated with this request are in excess of $25.00, please obtain our approval before any such charges are incurred.

**Request for Expedited Processing:** Pursuant to 5 U.S.C. § 552(a)(6)(E)(ii)(I) and 31 C.F.R. § 1.4(e), we request that this request be processed on an expedited basis. Treasury Department regulations implementing FOIA demand that FOIA requests be processed on an expedited timeline when it is determined that the request involves "[a]n urgency to inform the public about an actual or alleged Federal government activity, if made by a person who is primarily engaged in disseminating information." 31 F.C.R. § 1.4(e). The regulations further explain that to satisfy the "urgency to inform" standard, the requestor must establish that "the records requested pertain to a matter of current exigency to the public and that delaying a response to a request for records would compromise a significant recognized interest to and throughout the general public." *Id.* Here, there can be no question that the requested records satisfy that standard. Friends of the Earth requests records that pertain to U.S. Department of Treasury's response to the COVID-19 pandemic, and in particular, the agency's implementation of the CARES Act as it pertains to debt-strapped energy companies, their trade associations, and the financial institutions who are their biggest lenders.

The CARES Act was passed to provide support for the American public, businesses, and federal and state agencies during the coronavirus outbreak. The largest single appropriation was made was $454 billion deposited from the Treasury to the Federal Reserve, to be used to establish emergency lending programs under section 13(3) of the Federal Reserve Act. Once leveraged, the initial investment could grow in size to $4.5 trillion—arguably the largest single government intervention in the history of our economy. Although these programs are ultimately managed through the Federal Reserve, the Secretary of the Treasury must approve of new programs and agree to modifications of existing programs.

As of May 18, 2020, only $185 billion in funds from the CARES Act has been deployed. Ensuring that the remaining funds go to support the general economy as intended and not well-connected special interests is a matter of urgency. This urgency is especially stark in light of recent reports that the Treasury and Federal Reserve have already begun to modify existing programs to better facilitate access by the oil and gas industry. For example, the Main Street Lending Program – one of the aforementioned programs – was modified from its original design along terms officially sought by the oil and gas industry (see, e.g. *Politico,* "Fed's expansion of lending program sparks oil bailout worries."*).

In addition to the immediate public health concerns to subsidizing the oil and gas sector, this sort of favoritism is potentially athwart of the law itself, which requires that aid through these programs be "broad based" and not favor individual companies and industries over others.

---

draft our own reports and articles on the issues, and disseminate the information broadly through our own publications to our members and other interested persons. *See, e.g., supra*, note 2.

6



The records sought from financial institutions serve a similar purpose. The asset manager BlackRock is currently under contract to implement key aspects of programs established under the CARES Act. This includes the bulk purchasing of non-investment grade financial products that disproportionately contain the debt of fossil fuel companies. Similar concerns are at play regarding large banks. There is substantial risk of back-door support for the heavily indebted oil and gas industry as part of general provisions under the CARES Act meant to inject liquidity into the economy (see, e.g. *American Prospect*, A Climate Bailout Is a Big Finance Bailout).

The design of these programs and any potential reforms to them should be discussed by members of Congress, the news media, and the general public – and those discussions should be based on the broadest available information. The lending programs under the CARES Act are being implemented on an ongoing basis; dozens of lawmakers now support legislation to modify key aspects of the lending programs as they relate to fossil fuels. With an opportunity to modify the CARES Act potentially imminent as part of additional coronavirus legislation, the time-sensitive nature of this request is clear. Responding quickly will allow Friends of the Earth to disseminate to the public and to Congressional members invaluable resources both to improve implementation of current COVID-19 relief packages, and better inform future legislation.

The coronavirus relief packages are intended to quickly alleviate economic pressure from the outbreak. Accordingly, assessing how agencies are using and allocating those funds and informing the public of how public relief funds are being allocated *before* they are distributed are undoubtedly "urgent" matters. Moreover, delaying a response to this request would risk allowing U.S. Department of Treasury to oversee the disbursement of potentially trillions of dollars without any meaningful public input or scrutiny, thus "compromis[ing] a significant recognized interest to and throughout the general public." 31 C.F.R. § 1.4(e).

In support of its request for expedited processing, FOE has attached a sworn declaration describing the basis for making the request and establishing that one of FOE's primary missions is information dissemination. Accordingly, FOE satisfies the criteria for expedited processing. We expect a response to this request within 10 calendar days. In accordance with Treasury regulations, if this request for expedited processing is denied, we expect a detailed justification for the determination within ten calendar days. 31 C.F.R. § 1.4(e)(5).

If this FOIA request is denied in whole or in part, we expect a detailed justification for withholding the records. We also request any segregable portions of records that are otherwise not expected to be disclosed by the U.S. Department of Treasury in response to this request. Finally, we request that any documents responsive to this request be released by the U.S. Department of Treasury to Friends of the Earth on a rolling basis rather than the Department holding all of the documents for a one-time release. Friends of the Earth reserves the right to appeal any denial of this request.

If you are not the appropriate official to handle this request, please forward this letter to the appropriate person, and let us know that you have done so. Please contact me at the below email

1101 15th Street, NW • 11th Floor • Washington, DC 20005 • (202) 783-7400 • www.foe.org
2150 Allston Way • Suite 360 • Berkeley, CA 94704 • (510) 900-3150



address with any questions you may have about the materials I am requesting. Thank you for your immediate attention to this matter.

Sincerely,

Lukas Ross
Senior Policy Analyst
Friends of the Earth
1101 15th Street NW, 11th Floor
lross@foe.org
202-222-0724 (direct)
845-741-5639 (cell)

8

Exhibit 2:      Declaration of Lukas Ross, attached to June 4, 2020 FOIA Request

## DECLARATION OF LUKAS ROSS

I, Lukas Ross, declare as follows:

1.      I have personal knowledge of the matters asserted in this declaration, and if called upon to testify, I would state the same.

2.      I submit this declaration in support of Friends of the Earth's ("FOE") request for expedited processing of its June 4, 2020 Freedom of Information Act ("FOIA") request to offices located in the U.S. Department of the Treasury, for certain records concerning communications between the agency and identified parties.

3.      I am Program Manager for the Climate and Energy Program at FOE. In that role, my primary responsibility is to scrutinize government activity that may impact human health and the environment, and to disseminate information on those activities to the public. To that end, I compile information obtained both from public sources, and through FOIA requests, and use my expertise and editorial skills to quickly synthesize the information, develop meaningful alerts, reports, fact sheets, infographics, editorials, etc., and disseminate those products to FOE's members and supporters, journalists and other members of the news media, policymakers, congressional offices, and the public at large. In this way, I help facilitate and promote FOE's primary objective of disseminating information relevant to environmental concerns.

4.      A key aspect of our recent work has been the investigation and publication of how the fossil fuel industry continues to benefit from state and federal subsidies. Accordingly, the provisions in the CARES Act that allow the use of emergency authority to bail out the fossil fuel industry have been of particular concern both to FOE and to the public at large. Indeed, the significant and compelling public interest in the use of CARES Act funds and programs to benefit the fossil fuel industry is demonstrated by the numerous news articles on the topic, (*see,*

*e.g.*, *Politico,* "Fed's expansion of lending program sparks oil bailout worries"; *see also*

*American Prospect*, A Climate Bailout Is a Big Finance Bailout), as well as continuing efforts by

certain congressional members to call attention to and amend the provisions that allow fossil fuel

companies to take advantage of the emergency relief, *see, e.g.*, Press Release, U.S. Congressman

Jamie Raskin, ReWind Act Prohibits Bailout of Fossil Fuel Industry with CARES Act Funds

During Public Health Crisis (May 5, 2020), *available at* https://raskin.house.gov/media/press-

releases/rewind-act-prohibits-bailout-fossil-fuel-industry-cares-act-funds-during-public; *see also*

Rachel Frazin, *Legislation Aims to Block Fossil Fuel Companies from Receiving Coronavirus

Aid*, The Hill (May 5, 2020), *available at* https://thehill.com/policy/energy-environment/496263-

legislation-aims-to-preclude-fossil-fuel-companies-from-receiving.

5.      I have personally published several fact sheets and reports highlighting the

financial instability of key industry players and the risks presented by the unprecedented

authority the CARES Act granted to the Treasury Department and the ways in which that

authority could benefit Big Oil. *See* Lukas Ross, *The Big Oil Money Pit: How the $750 Billion in

New Stimulus Spending Could Prop Up Failing Polluters*; Lukas Ross, *Cashing in on COVID:

Tax Breaks, Royalties and Stimulus Loans*; Lukas Ross, *No Bailout for Fracking*. I have shared

these fact sheets with members of Congress and their staff, FOE's members and supporters, and

journalists, as well as with the general public by posting them on FOE's website.

6.      As part of my efforts to monitor the relationship between federal regulators and

the fossil fuel industry, I review public disclosures by lobbyists for the fossil fuel industry. I

discovered that a number of the entities identified in our FOIA request have been engaging in

closed-door conversations with the Treasury Department regarding key issues related to the

agency's coronavirus response.

7.      As described in the FOIA request, the CARES Act vested various officials in the U.S. Department of the Treasury with significant discretion to support the design of massive new lending programs meant to support the general economy amidst the coronavirus downturn. If loan programs are designed in a way that grants the oil and gas industry unfair access, The CARES Act could become a vehicle for a *de facto* bailout to an industry that poses devastating environmental, socioeconomic, and public health impacts. Worse, industry efforts to influence the Department's approval of CARES Act relief is happening in secret, behind closed doors, without any public input or scrutiny. Without public input, the Department risks basing whether its approval of new lending programs that benefit fossil fuel companies is "in the public interest" solely on industry interests and self-serving representations. The public has a significant interest in ensuring that public funds and programs that were intended to support small businesses, individuals, and families through a global health crisis are not redirected towards propping up the fossil fuel industry, which is financially risky and environmentally destructive.

8.      FOE has met with over a dozen congressional offices to discuss the fossil fuel industry's efforts to use funds and programs authorized under the CARES Act as a bail out. These conversations include discussions of how to restrict or revoke executive authority to implement the CARES Act to the benefit of fossil fuel companies. I have disseminated the above-mentioned fact sheets and reports that I generated regarding the fossil fuel industry's efforts to lobby agencies within the Department of the Treasury to congressional members and their staff, and have been told by congressional staffers that the information is both highly relevant and useful to efforts to improve congressional oversight of the implementation of the CARES Act, develop legislative proposals to address the shortcomings of the CARES Act, and

educate constituents on the ongoing public debate regarding the use of public funds to subsidize the oil and gas industry.

9.     FOE's FOIA request will provide information directly relevant to the ongoing public debate regarding the appropriate use of emergency funds and programs under the CARES Act to benefit the fossil fuel industry, and will allow FOE to quickly respond to industry lobbying efforts by disseminating information to its members, Congress, and the public at large to ensure that the U.S. Department of the Treasury receives input from all stakeholders.

10.     Any delay in processing FOE's request will seriously compromise FOE's and the public's interests in meaningfully participating in debates over such important and pressing issues as the appropriate use of coronavirus relief funds, the government's support of an industry that has brought the world to the brink of climate catastrophe, and the outsized influence that industry lobbyists exercise over policymakers. Additionally, any delay in the processing of FOE's request risks delivering information that is ultimately of limited utility. For example, once the Treasury Department approves relief and lending programs associated with COVID-19, the additional financial risk will have already been assumed and taxpayers will have been made liable. Thus, it is of paramount importance that FOE, the public, and Congress understand how the Department plans to consider new lending or relief programs *prior* to agency officials' reaching any decision to approve such programs. Finally, any delay in the processing of FOE's request would preclude FOE, the public, and Congress's access to information directly relevant to legislative proposals and negotiations regarding the curtailing of executive authority to use CARES Act funds and programs to benefit the fossil fuel industry, and to additional coronavirus relief packages. If the Department does not make the requested information available expeditiously, Congress may move forward with its legislative proposals without the benefit of

all of the relevant information, which hinders the development and implementation of meaningful and effective solutions to these matters of national importance.

11.     For all these reasons, and for the reasons stated in FOE's FOIA request, FOE more than satisfies the requirements necessary to qualify for expedited processing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated: __June 4, 2020_____                    *Lukas Ross*
                                                _____
                                                Lukas Ross

Exhibit 3:      Acknowledgment Letter from U.S. Department of Treasury



### DEPARTMENT OF THE TREASURY
### WASHINGTON, DC

June 8, 2020

Re:  2020-06-047

Mr. Lukas Ross
Friends of the Earth
1101 15th Street, NW, 11th Floor
Washington, DC  20005

Email:  lross@foe.org

**<u>SENT VIA EMAIL</u>**

Dear Mr. Ross:

This concerns your Freedom of Information Act (FOIA) request, submitted to Department of the Treasury, dated June 4, 2020.  You are requesting the following:

*"Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Friends of the Earth requests information concerning the Department of the Treasury's implementation of the COVID-19 relief programs established under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, and how that implementation may be influenced by special interests. Specifically, Friends of the Earth requests information regarding specific interactions, meetings, communications, and relationships between the U.S. Department of the Treasury— including the Office of the Secretary, Office of the Deputy Secretary, and Counselor to the Secretary, as well as any individual officers or employees within those offices or contractors employed by those offices—and the specific entities listed below:*
• ***Employees or agents of the American Petroleum Institute****: Stephen Comstock, Kenneth Moy, William Koetzle, William Hupman III, and any other persons using the domain @api.org.*
• ***Employees or agents of the Independent Petroleum Association of America****: Barry Russell, Lee Fuller, Dan Naatz, Ryan Ullman, Mallori Miller and any other persons using domain @ipaa.org.*
• ***Employees or agents of ExxonMobil****: Ed Coleman, Daniel Easley, Jane [Elise] Maraist Jones, Jennifer Linker, Keith McCoy, Jeanne Mitchell, Gantt Walton, and any other persons using the domain@exxonmobil.com.*
• ***Employees or agents of Blank Rome Government Relations****: David Thompson, Joseph McMonigle, and any other persons using the domain @blankrome.com.*
• ***Employees or agents of Phillips 66****: Richard Guerard and any other persons using the domain @p66.com.*
• ***Employees or agents of QEP****: Shane Schultz, and any other persons using the domain @qepres.com.*
• ***Employees or agents of the asset manager BlackRock****: Barbara Novick, Kathryn Fulton, Joanne Medero, Thomas Clark, Samantha DeZur, and any other persons using the domain @blackrock.com.*
• ***Employees or agents of Thomas Coburn LLP****:Charles Kyle Simpson, Jack N. Jacobson, Kenneth D. Salomon and any other persons using the domain @thomascoburn.com.*
• ***Employees or agents of Goldman Sachs****: Kenneth Connolly, Michael Paese, Michael Thompson, Joe Wall, Amy Hunt, Joyce Brayboy, Stephen Pastrick, Ryan Jachym, and any other persons using additional communications ending in the domain @gs.com*

• *Employees or agents of Morgan Stanley*: *Thomas McCrocklin, Michael Stein, David Kemps, and any other persons using emails ending in the domain @morganstanley.com.*
• *Employees or agents of FTI Government Consulting*: *Robert Moran, Emily Haas, and any other persons using the domain @fticonsulting.com.*
• *Employees or agents of Crossroads Strategies*: *Todd M. Weiss, Mathew Lapinski, Hunter Moorhead, Jason Van Pelt, Wally Burnett, Katherine Dapper, Jason Gleason, Chris Miller, Salim Alameddin, Rontel Batie, Alex Gleason, and any other persons using the domain @crshq.com*
• *Employees or agents of Bank of America*: *Edward Hill, Darrell Minott, James Carlisle, Spencer Taube and any other persons using emails emails sent from the domain @bankofamerica.com.*
• *Employees or agents of Citigroup Washington, inc*: *Candida Wolff, William Rys, and any other persons using the emails originating from a domain ending in @citi.com*
• *Employees or agents of Cypress Advocacy*: *Brant Imperatore, William Mueller, Chris Brown and any other persons using any emails sent from the domain @cypressgroupdc.com.*
• *Employees or agents of Mehlman, Castagnetti, Rosen and Thomas, INC*: *David Castagnetti, David Thomas, Sage Eastman, Constantine Hingson, Paul Thornell, and any other persons using the domain @mc-dc.com.*
• *Employees or agents of Wells Fargo*: *Sanders Adu, Daniel Archer, Julie Slocum, David Moskowitz, John Hand, Meghan Sullivan, Beth Zorc, and any other persons using emails sent from the domain ending in @wellsfargo.com*
• *Employees or agents of JP Morgan Chase*: *Timothy Berry, Head of Global Government Relations; Jason Rosenberg; Managing Director; Michelle Mesack, Hilary West, Alyssa Marois, Shannon Boozman, Elizabeth Herman, John Van Etten, and any other persons using emails ending in the domain @jpmorgan.com.*
*With regard to the information requested herein, Friends of the Earth specifically seeks the following:*
• *Records of communications between the U.S. Department of Treasury and any of the above listed entities, from February 24, 2020 to present, including any emails or facsimiles.*
• *Records of meetings held, including minutes of those meetings, any presentation materials including powerpoints, handouts, reference materials, meeting notes, and a full list of attendees, including personnel from the U.S. Department of Treasury and other federal and state agencies, any of the above-listed entities, and any other stakeholders."*

Treasury Departmental Offices (DO) has initiated a search for records that would be responsive to your request.  We will make every effort to provide you with a timely response; however, please be advised that unusual circumstances exist regarding the searches for and reviews of potentially responsive records.  The unusual circumstances are due to the consultation required between two or more program offices and/or a search is expected to result in voluminous records and/or a search is required to be conducted for records stored in field offices or warehouses off site; therefore, an additional processing extension of (10) days is required to process your request.

I will review your request for a fee waiver once our office ascertains that the billable costs will exceed our $25.00 billing threshold.

You have requested expedited processing.  The FOIA states that "each agency shall promulgate regulations … providing for expedited processing of requests for records."[1]  There are two categories of requests that merit expedited review under Treasury's FOIA regulations:  (1) requests for which a lack of expedited treatment "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual;" or (2) where there is an "urgency to inform the public about an actual or alleged Federal Government activity", if made by a person primarily engaged in disseminating information."[2]

---

[1] See 5 U.S.C. § 552(a)(6)(E)(i)
[2] See 31 CFR § 1.4(e)

Based upon my review of the information contained in your request, and in consideration of the two factors identified above, I have determined to deny your request for expedited processing.

You have not provided any evidence that information if not disseminated could pose an imminent threat to the life or physical safety of an individual or that there is an urgency to inform the public about an actual or alleged Federal Government activity.

You have the right to appeal adverse actions; the denial of expedited processing is considered an adverse action. Since Treasury's response to your request for expedited treatment constitutes an adverse action, you have the right to appeal this determination within 90 days from the date of this letter. By filing an appeal, you preserve your rights under FOIA and give the agency a chance to review and reconsider your request and the agency's decision. Your appeal must be in writing, signed by you or your representative, and should contain the rationale for your appeal. Please also cite the FOIA reference number noted above. Your appeal should be addressed to:

> Ryan Law
>   Deputy Assistant Secretary for Privacy, Transparency and Records
> FOIA Appeal
> FOIA and Transparency
> Privacy, Transparency, and Records
> Department of the Treasury
> 1500 Pennsylvania Ave., N.W.
> Washington, D.C. 20220

If you submit your appeal by mail, clearly mark the letter and the envelope with the words "Freedom of Information Act Appeal." Your appeal must be postmarked or electronically transmitted within **90 days** from the date of this letter.

If you would like to discuss this response before filing an appeal to attempt to resolve your dispute without going through the appeals process, you may contact the FOIA Public Liaison, for assistance via email at FOIAPL@treasury.gov, or via phone at (202) 622-8098.

A FOIA Public Liaison is a supervisory official to whom FOIA requesters can raise questions or concerns about the agency's FOIA process. FOIA Public Liaisons can explain agency records, suggest agency offices that may have responsive records, provide an estimated date of completion, and discuss how to reformulate and/or reduce the scope of requests in order to minimize fees and expedite processing time.

If you are unable to resolve your FOIA dispute through our FOIA Public Liaison, the Office of Government Information Services (OGIS) also mediates disputes between FOIA requesters and federal agencies as a non-exclusive alternative to litigation. If you wish to contact OGIS, you may contact the agency directly at the following address, emails, fax or telephone numbers:

> Office of Government Information Services
> National Archives and Records Administration
> 8601 Adelphi Road – OGIS
> College Park, MD 20740-6001
> Email: ogis@nara.gov
> Telephone: 202-741-5770
> Toll free: 1-877-684-6448
> Fax: 202-741-5769

Please note that contacting any agency official (including the FOIA analyst, FOIA Requester Service Center, FOIA Public Liaison) and/or OGIS is not an alternative to filing an administrative appeal and does not stop the 90-day appeal clock.

You may reach me via telephone at 202-622-0930, extension 2; or via email at FOIA@treasury.gov with regards to the processing of your request within DO.  Please reference the FOIA number at the top of the first page of this letter when contacting our office about this request.

Sincerely,

Michelle Henshaw
FOIA Case Manager, FOIA and Transparency
Privacy, Transparency, and Records

Exhibit 4:        Brookings Institution report: *Addressing the other COVID crisis: Corruption*

**Guidance for the Brookings community and the public on our response to the coronavirus (COVID-19) »**

**Learn more from Brookings scholars about the global response to coronavirus (COVID-19) »**

REPORT

# BROOKINGS

## Addressing the other COVID crisis: Corruption

Aryeh Mellman and Norman Eisen Wednesday, July 22, 2020

# Introduction

The need for oversight of Trump administration coronavirus spending has reached an inflection point.[1] Over the past few weeks, there have been reports that 27 clients of Trump-connected lobbyists have received up to $10.5 billion of that spending;[2] that beneficiaries have also included multiple entities linked to the family of Jared Kushner and other Trump associates and political allies;[3] that up to $273 million was awarded to more than 100 companies that are owned or operated by major donors to Trump's election efforts;[4] that unnecessary blanket ethics waivers have been applied to potential administration conflicts of interest;[5] and that many other transactions meriting further investigation have occurred.[6]

All this comes in a climate of Trump administration hostility to oversight. During negotiations on the CARES Act, the president claimed that he personally would "be the oversight."[7] He backed up that assertion with a signing statement after passage of the CARES Act stating that he would not treat some of the inspector general reporting requirements as mandatory.[8] The Treasury Department followed his lead by initially refusing to disclose the recipients of Paycheck Protection Program (PPP) funds.[9] They only relented in the face of crushing public and congressional pressure, resulting in a bevy of startling disclosures that call out for oversight.[10]

In this paper, we offer an assessment of how newly established congressional and executive branch COVID-19 oversight authorities should proceed in the face of these developments. In part one, we outline the four principal new oversight structures, assess the largely nascent state of their work, and point to strengths and weaknesses in their overall structure. We note that the two executive branch authorities appear already to have been threatened or adversely affected by President Trump, putting more pressure on the two congressional structures to achieve high functioning.[11]

---

**"The existence of vigorous oversight will ensure that the money disbursed by the CARES Act gets to the people who need and are entitled to those funds."**

---

In part two of the paper, we outline what these new oversight authorities can—and must—do to meet the urgency of the moment. That includes moving (more) rapidly, coordinating their operations and providing complete data. The existence of vigorous oversight will ensure that the money disbursed by the CARES Act gets to the people who need and are entitled to those funds. Conversely, inadequate oversight will mean favorable treatment for friends of the president and less relief for struggling small business owners and other American firms and individuals. The former is essential and the latter, abhorrent.

# Part 1. The new oversight mechanisms: Strengths and weaknesses

There are four new oversight bodies concerned with Trump administration coronavirus spending. The CARES Act established three of them that have different ambits and powers to oversee disbursement of the funds and their impact on the economy: The Congressional Oversight Commission (COC),[12] Pandemic Response Accountability Committee (PRAC),[13] and the Special Inspector General for Pandemic Recovery (SIGPR).[14] Additionally, the U.S. House of Representatives established a Select Subcommittee on the Coronavirus Crisis, meant to provide its own oversight of spending and other matters.[15]

## A. The Congressional Oversight Commission (COC)

The COC is composed of five members, including one chair, each selected by a Congressional leader.[16] The four current members are Pat Toomey (R-Pa.), Bharat Ramamurti, Donna Shalala (D-Fla.), and French Hill (R-Ark.).[17] The chair is meant to be selected jointly by House Speaker Nancy Pelosi (D-Calif.) and Senate Majority Leader Mitch McConnell (R-Ky.); the position is still vacant even though the other members had all been named by April 17.[18] Press reports had indicated that Gen. (ret.) Joseph Dunford, was being vetted for the role of chair, but he has recently withdrawn from consideration, seemingly putting the search back to square one.[19]

The COC's purpose is to submit monthly reports that assess the impacts of the CARES Act funds on the economy as a whole.[20] To do this, they can hire staff, hold hearings, and obtain official federal government data, but do not have subpoena power.[21] Of the trillions of dollars appropriated to deal with the crisis, the COC is meant to assess a $500 billion slice allocated to Treasury to lend to businesses and state and local governments to support and stabilize the economy.[22]

Without a chair, the COC has had a slow start. It has published three reports as of this writing.[23] The first, on May 18, was mostly comprised of background information on the coronavirus crisis and the ensuing legislation, as well as questions that the commission would seek to answer in its later work.[24] The second report, published on June 18, found that while the Federal Reserve had established five lending facilities in which Treasury could disburse the money, less than $100 billion of that $500 billion had actually been disbursed thus far, and only two of the five facilities had made any loans.[25] The $500 billion invested in the facilities is ultimately intended to support nearly $2 trillion in lending, but as of the report date, the facilities had lent just $6.7 billion.[26] The majority of that money—$5.5 billion—was spent by the Secondary Market Corporate Credit Facility, meant to support businesses by purchasing corporate debt and ETFs to instill liquidity in the credit market.[27] On June 2, the Fed made its first

loan through the Municipal Liquidity Facility, a $1.2 billion disbursement to Illinois.[28] The other facilities, meant to support businesses by purchasing majority stakes in their loans, have not yet made any loans.[29] The Main Street Lending Facility has begun accepting registrants but has not yet announced any disbursements, and the Primary Market Corporate Credit Facility and Term Auction Loan Facility are not operating at all.[30]

---

## "[B]ecause of possible gaps in other oversight, a high-functioning Congressional Oversight Commission is critical to the overall oversight structure."

---

While COC awaits full functionality, journalists have attempted to fill some of the void, and their work only highlights the urgency of getting the COC up and running. A recent investigative report found that the Treasury official running the coronavirus bailout maintains financial ties to a firm—founded by his father—that primarily trades in corporate debt, including junk bonds.[31] This conflict of interest is made more concerning by the facts that the Fed has never before bought corporate debt, and that the facility buying corporate debt was the first Fed facility to be capitalized.[32] COC member Bharat Ramamurti addressed the story on his personal Twitter account: "In the nine weeks since Congress gave the Treasury and the Fed $500 billion for economic 'stabilization,' they've used less than 10% of the money to create a single program that has serious conflicts of interest and, at best, a weak connection to stopping ongoing job losses."[33] This comment is important, but means less coming from a single member of the Commission on his Twitter account than it would from a full Commission, with adequate staffing, publishing regular reports, and holding regular public hearings. Indeed, upon publication of the COC's second report, Ramamurti opined that the lack of an appointed Chair and staff posed "serious obstacles to performing robust oversight."[34]

It is urgent that the COC gets a chair and a full staff so it will be able to fully undertake its work on the impact of the CARES Act on the economy. Until that happens, we cannot judge its effectiveness. As we shall see, because of possible gaps in other oversight, a high-functioning COC is critical to the overall oversight structure.

## B. The Pandemic Response Accountability Committee (PRAC)

The PRAC is currently made up of 20 inspectors general from across the federal government (and will expand to 21 when the Special Inspector General for Pandemic Recovery eventually joins). Nine members were specified by the CARES Act, and 11 others have come from various agencies.[35] The PRAC chair—appointed by the Chairperson for the Council of the Inspectors General on Integrity and Efficiency (CIGIE)—is currently Michael Horowitz, who is also the inspector general (IG) for the DOJ.[36] Horowitz, who is also the chair of CIGIE, had appointed Glenn Fine

to be chair of PRAC on March 30. However, President Trump replaced Fine as acting IG of the Department of Defense, making him ineligible to serve as PRAC chair.[37] Horowitz appointed Robert Westbrooks to the position of Executive Director on April 27, and personally stepped in to serve as Acting Chair of the PRAC.[38]

Unlike the COC, the PRAC is designed to prevent and detect fraud, waste, and abuse in disbursement of CARES Act funds by auditing and reviewing those funds and contracts made under them.[39] The PRAC also has a public-facing role, as the legislation requires it to set up a public website to promote transparency in CARES Act funding, providing detailed information on any disbursement over $150,000.[40]

The PRAC has a wider array of powers than the COC. In addition to the ability to commission audits, studies, and analyses, the PRAC has several ways of gathering information.[41] The CARES Act provides a muscular subpoena power.[42] The PRAC's subpoena power allows it to compel both documents and testimony from non-federal employees, unlike the standard IG power that only allows for documents.[43] From federal sources, the statute allows the PRAC to request and obtain information directly from the federal government, and "immediately" report the circumstances to Congress if the information is not provided.[44] The PRAC also shall report to the Attorney General if it has any reasonable concern that federal criminal law has been violated.[45]

Other agencies are also required to report monthly to the PRAC on disbursements over $150,000. Each recipient of funds over $150,000 from any agency is required to provide quarterly reports to the disbursing agency and the PRAC on the total amount of funds received, and detail how disbursements over $150,000 were used, including the name and description of project, and the estimated number of jobs created or retained by the project.[46]

The PRAC set up its website on April 27, per the legislation.[47] The website contains a high-level overview of what industries and bodies funds were appropriated for, as well as several spreadsheets outlining the disposition of the funds in somewhat more detail. One spreadsheet depicts how much each federal agency has spent, totaling over $17 billion, and describes to what type of institutions the money went.[48] Website users can also look through contracts at the state and county level, with each individual contract broken out with identifying information, including agency, amount, and a (very) brief description of the good or service contracted for.[49]

It is too soon to tell whether the PRAC will provide the robust oversight hoped for from it, and the president's assault on Fine was a blow. Acting Chair Horowitz is capable and dedicated, but already has two major jobs at DOJ and CIGIE. There is no telling if the president will also interfere with or remove the next permanent chair. Because of the president's power over IG's, and his demonstrated proclivity for abusing it, this pillar of oversight remains at risk despite its broad powers and the many hard-working and talented IG's associated with it.

## C. The Special Inspector General for Pandemic Recovery (SIGPR)

The SIGPR is nominated by the president and confirmed by the Senate.[50] This IG takes a fine-grained look at the loans and investments made by the Treasury Department under the CARES Act, auditing them to determine whether each business was eligible for each sort of funding; explain why it was appropriate to make each

transaction; describe each person made to manage each loan; and calculate the amount of loans made, and the government's loss or gain on each one.[51] Quarterly, the SIGPR is to issue reports summarizing the above information.[52]

To accomplish these goals, the SIGPR can hire experts and commission studies, and request information from the federal government.[53] If requested information is not provided, the SIPGR too can report the circumstances to Congress.[54]

The SIGPR's subpoena power is limited to that of other federal agency IGs.[55] Thus, the SIGPR can only subpoena documents and records from non-federal government entities but cannot compel testimony.[56] Further, the IG statute does not allow IGs to subpoena even records from federal government agencies, instead providing that "procedures other than subpoenas shall be used by the Inspector General to obtain documents and information from federal agencies."[57]

Brian D. Miller was nominated to be SIGPR on April 6. He had previously worked as a White House lawyer for the president, and there were profound questions about whether he could provide the type of rigorous oversight that is required. As a result, he spent some time making his way through the confirmation process.[58] He was confirmed by the Senate on June 2 on a mostly party-line vote, with just one Democratic senator voting to confirm.[59] This record does not inspire confidence that the SIGPR will do the job that is needed. This puts more pressure on the other entities in the oversight structure to function at a high level.

## D. The U.S. House Select Subcommittee on the Coronavirus Crisis

One final oversight body was created independently of the CARES Act. The United States House Select Subcommittee on the Coronavirus Crisis was voted into existence on party lines on April 23.[60] The Subcommittee is chaired by James Clyburn (D-S.C.) and its members include six other Democrats and five Republicans. This body was given a broad remit: reporting on the efficacy, equity, and transparency of taxpayer funds used during any aspect of the crisis, from preparedness and response, to executive branch policies, to the economic impact of the crisis, to the executive branch's response to oversight.[61] The Subcommittee can use subpoena power and hold public hearings.[62] While they have access to House records, they do not have direct access to federal government data, with the instruction to report to Congress if it is not freely given, as the other, CARES Act-created oversight bodies, do. The subpoena power should allow them to access this information, but the Trump administration has shown itself willing to reject subpoenas and attempt to drag out court fights on a number of occasions and may be willing to do so with respect to the Subcommittee as well.[63]

---

**"The U.S. House Select Subcommittee on the Coronavirus Crisis has used its oversight authority and gotten results."**

---

The Subcommittee has used its oversight authority and gotten results. The day after the Republican appointees were announced, the Subcommittee sent public letters to five companies asking that they return PPP small business loans, and if not, to produce all PPP-related communications between the company and various banks and government entities.[64] Each of the companies had market capitalizations of over $25 million, over 600 employees, and had received PPP loans of $10 million. Unfortunately, only the Democratic members of the Subcommittee signed on to the letters and Steve Scalise (R-La.), the Republican leader of the Subcommittee, released a statement calling the action "outrageous" and "harassing."[65]

Despite that, the Subcommittee scored a quick win. One company, MiMedx, quickly returned their $10 million loan.[66] The four others have not, either stating that they qualify for, and need, the funds due to unique circumstances, or simply keeping quiet.[67] In one case, a bipartisan group of congressmembers sent an open letter to the Subcommittee expressing their support for allowing Universal Stainless and Alloy Products to keep the funds, likely bolstering the company's decision not to return the loan and undermining the effectiveness of the initial letter from the Subcommittee.[68]

Aside from the PPP dustup, the Subcommittee has taken additional and effective actions, including successfully applying pressure to increase transparency for PPP recipients.[69] Congressional urging was an important part of reversing the administration's initial refusal to provide that information. The Subcommittee has also held hearings on a range of issues, including protections for essential workers, aid to cities, and racial disparities in the impact of coronavirus.[70] There was both Democratic and Republican participation in these hearings, though not necessarily consensus. On June 2, the Subcommittee sent a letter to the secretary of the Department of Health and Human Services requesting copies of the contracts that the federal government had made with private companies to manufacture coronavirus vaccines to ensure that they would be affordable when completed.[71] This letter was signed by two Democratic members of the Subcommittee: James Clyburn and Carolyn Maloney, with their Republican counterparts cc'd.[72]

The Subcommittee has an absolutely critical role to play given the doubts about the SIGPR, the presidential danger to the PRAC, and the limited remit of the COC, not to mention the COC's failure so far to achieve full functionality. The Subcommittee should continue to ramp up its work rapidly and impactfully. We now turn to how it, and the other oversight authorities, should do that.

# Section 2. Three main strategies for oversight

As the new oversight bodies seek to gain momentum, they would do well to take lessons from what did and did not work in past oversight efforts, including of the funds spent in the aftermath of the 2008 financial crisis. Three principal points stand out: providing fast disclosure, making complete disclosure, and deconflicting oversight.

## 1. Fast disclosure

The speed of disclosure is crucial not only for spotting trends and adjusting on the fly, but so that funds can be disbursed before too many small businesses collapse and industries unduly consolidate. One immediate outcome of the Treasury Department's decision in the 2008 financial crisis to rescue large banks while letting smaller ones collapse was consolidation among the biggest and healthiest banks; "America's largest banks today manage an even greater fraction of the nation's wealth than before the crisis."[73] Further out into the future, there was potential for even greater consolidation; bigger banks were considered safer by investors because they had more assets to fall back on and were more likely to be bailed out by the government in a future crisis.[74]

---

## "The speed of disclosure is crucial not only for spotting trends and adjusting on the fly, but so that funds can be disbursed before too many small businesses collapse and industries unduly consolidate."

---

These concerns are no less important in the current crisis, including because the coronavirus crisis if anything affects a broader range of businesses and sectors of the economy. If CARES Act funds are not spent quickly enough, smaller businesses without sufficient financial cushion will either fail, or will be bought out by larger ones, increasing consolidation across the board. This is particularly troubling given the already-high levels of both product and labor market consolidation across a wide variety of industries.[75] Excessive consolidation is not necessarily a danger for every industry the way it was for banks after the 2008 crisis. For some industries, such as non-chain restaurants and mom-and-pop small businesses, the greatest economic concern is not industry consolidation, but outright failure due to an inability to pay their bills. Fast disclosure is crucial for these types of businesses as well, since systemic errors in disbursement that take too long to catch can result in failure of these businesses.

Fast disclosure can prevent these dramatic shifts in the economy by allowing oversight bodies to stay on top of the range of government agencies disbursing money across industries, ensuring that the money gets to the appropriate parties as quickly as possible, and making recommendations as needed to enable small businesses to survive beyond the crisis. For example, when the Federal Reserve initially announced the terms of its Municipal Liquidity Facility (MLF), the parameters would have excluded the 35 most African-American cities, whose residents were already disproportionately affected by the pandemic.[76] In response to this problem, the Fed expanded the standards to include some of those previously left-out cities.[77] This correction only occurred because the Fed was fully transparent with its terms early in the process and journalists, politicians, and academics were able to identify the issue and raise the problem. Had the terms been secret, the disparity would only have been discovered much later, after the impacts of denying loans to those cities had occurred.

Each of the oversight bodies has the power to obtain data from the federal government and should use this power frequently to fully obtain the information necessary for analyzing the efficacy of the program. It should be noted that the speed of the disclosure has already been hindered from multiple quarters. President Trump fired the first

PRAC Chair, leading to replacement with an acting chair and a 20-day delay until a new executive director could be appointed. The COC still does not have a chair. The SIGPR was just confirmed on June 2. All told, it is crucial that these bodies begin their work as quickly as possible to prevent unfortunate knock-on effects resulting from delayed action.

## 2. Complete disclosure

Just as important as the speed of disclosure is completeness. Especially in an unprecedented situation like this, complete disclosure allows for the government, the oversight bodies, and watchdog groups to fully analyze the data and adopt to unexpected trends. The initial release of PPP data this week was welcome but represents just a small fraction of spending to date. Full disclosure is urgently needed.

History offers a guide to the difference this can make. To take one example, during the 2008 financial crisis, the Treasury Department made the logical assumption that providing funds to banks through the Capital Purchase Program (CPP) would spur them to lend to businesses. In reality, a retrospective analysis by the Congressional Oversight Panel (COP) found that there was no correlation between provision of CPP funds and new lending by banks.[78] Because Treasury did not gather the data to assess this at the time, they undoubtedly wasted vast amounts of money on this program that could have been better spent elsewhere. Better collection and analysis of data could have directed the funds in a more effective manner.

The oversight bodies should use the most cutting-edge technology available to build on the model established by the Recovery Accountability and Transparency (RAT) Board to anticipate problems and assess disbursement of the funds.[79] By tracking the funds and using data analytics to highlight suspicious activity, the oversight bodies can better focus their resources on problematic areas and ensure that accuracy is not sacrificed in the name of speed. Federal government transparency of TARP funds improved over time, and the coronavirus oversight bodies should push the agencies to begin from where TARP was at its most transparent and go even further.[80] At a minimum, Treasury should offer information as to where every dollar is going, and what it will be used for, disclosing every step in the process. As was done by the end of TARP, Treasury should post contracts online and disclose the identity of subcontractors.[81]

---

## "Comprehensive disclosure has already been hampered by the administration."

---

Comprehensive disclosure has already been hampered by the administration. The IG of the Treasury Department reported that "Treasury has not provided user-friendly means for recipients [of CARES Act funds] to meet reporting requirements."[82] When the IG raised this issue with Treasury, the department initially asserted that the reporting requirements only applied to part of the CARES Act (Division B, and not Division A), which would exclude much of

the Act from oversight.[83] Relying on this reasoning, the reporting requirements would have excluded the vast majority of the CARES Act, including the $349 billion PPP, the nearly $500 billion for the Fed facilities, and the $150 billion directed toward states, territories, and tribes.[84]

Under pressure from all sides, Treasury relented and released PPP data this week, but even that disclosure included less than 75% of the total PPP money and 15% of the borrowers.[85] Treasury also backed down from their overall claim that only Division B was subject to reporting requirements in a recent letter.[86] Nevertheless, there is much more information, about the PPP and other programs, that the government can and should provide.

## 3. Deconflicting oversight

The four bodies have separate but overlapping powers and areas of responsibility. It is paramount that they liaise with each other and share information to effectively coordinate, reduce redundancy, and improve the efficacy of each of the other bodies.

With its mandate to detect systemic waste, fraud, and abuse in disbursement of CARES Act funds, the PRAC should focus on gathering and analyzing data. That will ensure the public knows where every dollar is going and what it is being used for, and allow the PRAC to spot trends in order to adjust the legislation and priorities as needed. This requires a far more detailed public analysis than is currently available on the website. The PRAC should publicize its existing website to encourage and empower citizens to find out information relevant to their zip codes and report suspicious activity they are aware of.[87]

SIGPR should take a closer look at that information to drill down on bad actors to recover misused funds and, where necessary, turn over fraudsters to the DOJ for prosecution. To date, the SIGTARP has recovered $11 billion, a return on investment of over 3,000%, and convicted 384 people with a 97% conviction rate.[88] Importantly, the SIGPR should be staffed with industry and CARES Act-specific expertise to catch fraudsters, especially those who will use the new law to commit fraud in novel ways.

Standard law enforcement personnel will investigate and prosecute frauds as they come upon them as well; this has already happened even in the program's infancy.[89] Nevertheless, with trillions of dollars going out the door, there is simply too much activity to rely on traditional law enforcement personnel alone to police every fraud. It will be essential to have dedicated and expert staff to investigate the sophisticated frauds that will undoubtedly occur.

---

**"[W]ith trillions of dollars going out the door, there is simply too much activity to rely on traditional law enforcement personnel alone to police every fraud."**

---

Within its ambit, the COC has a broad mandate (though no subpoena power). It should continue its efforts on assessing the holistic effects of the CARES Act on the overall financial system, including any racial or economic disparities. The COC's first reports were effective in bringing new information to light on disbursement of funds and getting some initial questions answered by Treasury and the Fed, but there is far more work to be done.

The House Subcommittee has subpoena power and the most media-ready platform. It should use these elements to publicize the most important findings of the other bodies, or pursue them further in public hearings. Working in a bipartisan fashion will be crucial to its effectiveness. The Subcommittee's first action was undermined by the Republicans on the Subcommittee stating that the letters sent by their Democratic counterparts were ill-conceived. Given the urgency of the crisis, hopefully more responsible bipartisanship will be forthcoming. Targets of oversight are going to be far less likely to comply with Subcommittee requests if their every action is followed with a criticism of that action from the minority members of the same Subcommittee.

The four oversight bodies will, and should, overlap to an extent; some redundancy will be useful to make sure that all ground has been covered. Nevertheless, the oversight bodies should communicate with each other to ensure that their redundancy is purposeful and meaningful, rather than accidental and extraneous.

# Conclusion

"Extraordinary government programs can benefit from, and indeed may require, extraordinary oversight."[90] There may be no situation more extraordinary than the coronavirus crisis, which saw Congress near-unanimously appropriate trillions of dollars to rescue the economy. With that amount of money flowing, and with the recent warning signs of possible abuses, it is crucial for the economy as a whole and for individual businesses that oversight bodies do that work and do it well.

---

# Appendix: Matters for further investigation—Selected excerpts from press reports

- "Transportation Secretary Elaine Chao's family's business, Foremost Maritime, got a loan valued at between $350,000 and $1 million. Chao is the wife of Senate Majority Leader Mitch McConnell, R-Ky."[91]
- "Perdue Inc., a trucking company co-founded by Agriculture Secretary Sonny Perdue, was approved for $150,000 to $350,000 in loan money. A spokesperson for the Agriculture Department said Perdue Inc., a trucking service, said the loan was for about $182,000 and supported 27 jobs. Perdue's adult children are 99% stakeholders in a trust that indirectly owns the company, and the secretary did not have any influence on the SBA's loan decisions or the company's decision to apply for aid, the spokesperson said."[92]
- "Irongate Azrep Bw LLC, a Trump Organization partner in a hotel and residential tower in Waikiki, Hawaii, received a loan from the Paycheck Protection Program in the range of $2 million to $5 million, according to the data released on Monday, which shows loan ranges. Calls to Trump Waikiki weren't returned. Trump International Hotel & Tower at Waikiki isn't owned by Trump or his company, according to its website. Irongate uses the Trump name under license from Trump Marks Waikiki LLC, which is owned by Trump."[93]

- "Companies owned by the family of Jared Kushner, the White House senior adviser and Trump son-in-law, also received several PPP loans. Princeton Forrestal LLC, a Kushner Cos. affiliate that bought the Princeton Marriott Hotel in 2018, received a loan of between $1 million and $2 million, according to the SBA data."[94]

- "The law firm of one of Trump's top lawyers, Marc Kasowitz, also appears to have received a PPP loan, according to the SBA data. Kasowitz Benson Torres LLP received between $5 million and $10 million to retain 402 jobs, the data show."[95]

- "A company with a name matching one listed on the 2017 financial disclosure of Education Secretary Betsy DeVos received at least $6 million, the data show. The loans were made to Renaissance Acquisition Company LLC, which operates Indianapolis-based RenPSG a provider of services to nonprofits."[96]

- "Forgivable loans financed by the federal government also benefited a media company run by Trump's longtime friend David Pecker. American Media, the publisher of the National Enquirer, received a loan in April from Bank of America Corp. of between $2 million and $5 million, records show."[97]

- "The New York Observer, the news website that Kushner ran before entering the White House and is still owned by his brother-in-law's investment firm, was approved for between $350,000 and $1 million."[98]

- "Esplanade Livingston LLC, whose address is the same as that of the Kushner Companies real estate development business, was approved for $350,000 to $1 million."[99]

- "In April, a bank approved a loan of between $150,000 and $350,000 for the Pennsylvania dental practice of Albert Hazzouri, who golfs with Trump and frequents Mar-a-Lago, the president's private club in Palm Beach, Florida."[100]

- "A small indoor lettuce farming business applied for funds between $150,000 and $350,000 SBA data show. Trump Jr. had invested in Eden Green Technology, a vertical farming company just south of Dallas, whose co-chair, Gentry Beach, was a Trump campaign fundraiser."[101]

- "Cottage Hospital, a 25-bed critical access facility in Woodsville, New Hampshire, received between $2 million and $5 million in PPP loans. The hospital's CEO, Maria Ryan, is a longtime close associate of Giuliani's."[102]

- "G.H. Palmer Associates, a real estate firm run by longtime Trump backer Geoffrey Palmer, was approved for a loan. The company is listed as 'G.H. Palmer Inc.' on the list of loans that were distributed, but the address of the company matches that of Palmer's real estate firm in Beverly Hills, California. The company was approved for a loan worth $350,000 to $1 million."[103]

- "Dezer Development, a real estate company founded by Michael Dezer, says on its website that it has the same address as Trump International Beach Resort in Miami, Florida. The Dezer website says that its 'branded real estate portfolio includes six-Trump branded towers.' Dezer got between $350,000 and $1 million from PPP."[104]

- "Then there's White Stallion Energy, a coal mining company out of Indiana, which is owned by Steven Chancellor. The coal executive reportedly met with former EPA chief Scott Pruitt to discuss the softening of a pollution law. White Stallion gave $175,000 to Trump's inaugural committee. Below, he is shown shaking Trump's hand, along with Indiana Sen. Mike Braun, when the president visited the state in 2018. White Stallion saw between $5 million and $10 million in PPP loans."[105]

- "As much as $273 million in federal coronavirus aid was awarded to more than 100 companies that are owned or operated by major donors to President Donald Trump's election efforts, according to an Associated Press analysis of federal data."[106]

- "Among the recipients named Monday was the conservative website NewsMax, which was approved for a loan up to $5 million on April 13, the data shows. NewsMax CEO Christopher Ruddy has donated $525,000 to political committees supporting Trump, records show. He did not respond to a request for comment."[107]

- "Muy Brands, a San Antonio, Texas-based company that operates Taco Bell, Pizza Hut and Wendy's franchises, was approved for a loan worth between $5 million and $10 million. Its owner, James Bodenstedt, has donated $672,570 to Trump since 2016, records show. The company did not respond to a request for comment."[108]

- "Irving, Texas-based M Crowd Restaurant Group, which owns 27 Texas restaurants including the Mi Cocina chain, was approved for between $5 million and $10 million. Ray Washburne, one of the company's founders, was vice chairman of the Trump Victory Committee in 2016 and donated $100,000 to the PAC last August. The company did not respond to a request for comment."[109]

- "Broadcasting company Patrick Broadcasting, which is owned by Texas Lt. Gov. Dan Patrick, a firebrand conservative and former talk radio host, received a loan of $179,000, according to Patrick's senior adviser Sherry Sylvester. Patrick is the Texas chairman of Trump's presidential campaign."[110]

- "Churches connected to President Donald Trump and other organizations linked to current or former Trump evangelical advisers received at least $17.3 million in loans from a federal rescue package designed to aid small businesses during the coronavirus pandemic."[111]

- "Those receiving loans include City of Destiny, the Florida church that Trump's personal pastor and White House faith adviser Paula White-Cain calls home, and First Baptist Dallas, led by Trump ally and senior pastor Robert Jeffress. City of Destiny got between $150,000 and $350,000 from the Paycheck Protection Program, or PPP, and First Baptist Dallas got between $2 million and $5 million, according to data released by the Treasury Department on Monday."[112]

- "Other program beneficiaries connected to veteran evangelical Trump allies include The Faith & Freedom Coalition, founded by conservative strategist Ralph Reed, which got a loan of between $150,000 and $350,000. That group reported retaining 24 jobs with its loan, according to government data."[113]

- "King Jesus International Ministry, the Miami megachurch where Trump launched his evangelical outreach push ahead of November's election, received a loan of between $2 million and $5 million according to the data. That church's pastor, Guillermo Maldonado, was also among a group of faith leaders who met and prayed with Trump at the White House last fall."[114]

- "An energy drink company that donated six figures in corporate money to President Donald Trump's preferred super PAC got an emergency small business loan worth between $5 million and $10 million, according to government data released this week. Vital Pharmaceuticals, the maker of Bang Energy, gave $250,000 last year to America First Action, the only super PAC with the president's official endorsement. The company's CEO, Jack Owoc, is an ardent Trump supporter who has been pictured socializing with members of Trump's family."[115]

*The Brookings Institution is a nonprofit organization devoted to independent research and policy solutions. Its mission is to conduct high-quality, independent research and, based on that research, to provide innovative, practical recommendations for policymakers and the public. The conclusions and recommendations of any Brookings publication are solely those of its author(s), and do not reflect the views of the Institution, its management, or its other scholars.*

Report Produced by **Governance Studies**

Viewed as a leading, independent voice in the domestic policymaking sphere, the Governance Studies program at Brookings is dedicated to analyzing policy issues, political institutions and processes, and contemporary governance challenges. Our scholarship identifies areas in need of reform and proposes specific solutions to improve governance worldwide, but with a particular emphasis on the United States.

## Footnotes

1. 1 For related discussion, see Norman Eisen, Damon Silvers, Lisa Gilbert, and Liz Hempowicz, *We need Congress to watch pandemic spending closely. Here's how it can do it*, The Washington Post (May 13, 2020), https://www.washingtonpost.com/outlook/2020/05/13/coronavirus-spending-house-oversight/ and Norman Eisen and Victoria Bassetti, *Implementing CARES honestly and effectively*, in *Reopening America: How to Save Lives and Livelihoods*, eds. John R. Allen and Darrell M. West (Washington: The Brookings Institution 2020), 79-82, https://www.brookings.edu/interactives/reopening-america-and-the-world/.
2. 2 Mike Tanglis and Taylor Lincoln, *COVID Lobbying Palooza,* Public Citizen (July 6, 2020), https://www.citizen.org/article/covid-lobbying-palooza/.
3. 3 *See e.g.*, Caleb Melby and Shahien Nasiripour, *Trump's Waikiki Partner, Kushner Family Among PPP Borrowers,* Bloomberg (July 6, 2020), https://www.bloomberg.com/news/articles/2020-07-06/trump-s-waikiki-partner-devos-tied-company-among-ppp-recipients, detailing payments to a Trump International Hotel, the firm of one of Trump's top lawyers, an affiliate of the Kushner family company, and the company of Trump's longtime associate David Pecker.
4. 4 Briand Slodysko and Angeliki Kastanis, *Trump donors among early recipients of coronavirus loans,* AP News (July 7, 2020), https://apnews.com/00a34243825661313f2cb6a0f6a21720.
5. 5 Jonathan O'Connell and Aaron Gregg, *SBA exempted lawmakers, federal officials from ethics rules in $660 billion loan program,* Washington Post (June 26, 2020), https://www.washingtonpost.com/business/2020/06/26/sba-exempted-lawmakers-federal-officials-ethics-rules-660-billion-loan-program/.
6. 6 We itemize additional reporting in the Appendix.
7. 7 Seung Min Kim et al, *Trump's resistance to independent oversight draws bipartisan scrutiny,* Washington Post (April 9, 2020), https://www.washingtonpost.com/politics/trumps-resistance-to-independent-oversight-draws-bipartisan-scrutiny/2020/04/08/d9776f48-79af-11ea-9bee-c5bf9d2e3288_story.html.
8. 8 Donald J. Trump, *Statement by the President,* The White House (March 27, 2020), https://www.whitehouse.gov/briefings-statements/statement-by-the-president-38/.
9. 9 Aaron Gregg, *Trump administration won't say who got $511 billion in taxpayer-backed coronavirus loans,* Washington Post (June 11, 2020), https://www.washingtonpost.com/business/2020/06/11/trump-administration-wont-say-who-got-511-billion-taxpayer-backed-coronavirus-loans/.
10. 10 Aaron Gregg and Jeff Stein, *In big reversal, Treasury and SBA agree to disclose details about many small business loan recipients,* Washington Post (June 19, 2020), https://www.washingtonpost.com/business/2020/06/19/treasury-sba-ppp-disclosure/.
11. 11 This paper principally addresses new, specially created coronavirus funding oversight efforts. Separately, the preexisting congressional oversight process is also working to answer a range of questions related to coronavirus. *See* Molly E. Reynolds et al, *How is COVID-19 affecting House oversight efforts?*, The Brookings Institution (July 13, 2020), https://www.brookings.edu/blog/fixgov/2020/07/13/how-is-covid-19-affecting-house-oversight-efforts/.
12. 12 CARES Act, Title IV, Subtitle A § 4020.
13. 13 CARES Act, Title VI, § 15010.
14. 14 CARES Act, Title IV, Subtitle A § 4018.
15. 15 H. Res. 935 (2020).
16. 16 CARES Act, § 4020(c).
17. 17 Kyle Cheney and Melanie Zanona, *Pelosi, McConnell name picks to serve on coronavirus oversight panel*, Politico (April 17th, 2020), https://www.politico.com/news/2020/04/17/french-hill-coronavirus-oversight-panel-192660
18. 18 *Id.*
19. 19 John Bresnahan et al, *Dunford withdraws as pick to lead coronavirus oversight commission,* Politico (July 14, 2020), https://www.politico.com/news/2020/07/14/joseph-dunford-withdraws-coronavirus-commission-361077.
20. 20 § 4020(b).
21. 21 § 4020(e).
22. 22 *Id.* at 4.
23. 23 The third report was published as this paper was going to press. *See* Congressional Oversight Commission, *The Third Report of the Congressional Oversight Commission* (July 20, 2020), https://www.toomey.senate.gov/files/documents/Oversight%20Commission%20-%203rd%20Report%20(FINAL)_7.20.20.pdf.
24. 24 Congressional Oversight Commission, *Questions About the CARES Act's $500 Billion Emergency Stabilization Funds,* (May 18, 2020), https://www.toomey.senate.gov/files/documents/COC%201st%20Report_05.18.2020.pdf.
25. 25 Congressional Oversight Commission, *The Second Report of the Congressional Oversight Commission* (June 18, 2020), https://www.toomey.senate.gov/files/documents/Congressional%20Oversight%20Commission%20Report%20(June%2018,%202020).pdf.

26. 26 *Id.* at 5.
27. 27 *Id.* at 5.
28. 28 *Id.* at 6.
29. 29 *Id.* $46 billion was also allocated for loans and loan guarantees to the airline and industry and businesses critical to maintaining national security, but none of these funds have been allocated yet either.
30. 30 *Id.*
31. 31 Justin Elliott et al, *This Treasury Official Is Running the Bailout. It's Been Great for His Family,* ProPublica (June 2, 2020), https://www.propublica.org/article/this-treasury-official-is-running-the-bailout-its-been-great-for-his-family.
32. 32 *Id.*
33. 33 @BharatRamamurti, Twitter, (June 2, 2020), https://twitter.com/BharatRamamurti/status/1267867244631076864.
34. 34 @BharatRamamurti, Twitter, (June 18, 2020), https://twitter.com/BharatRamamurti/status/1273635755705991168.
35. 35 § 15010(b)(2).
36. 36 § 15010(c)(1); Pandemic Response Accountability Committee, *PRAC Members*, https://pandemic.oversight.gov/about/prac/members.
37. 37 Ellen Nakashima, *Trump removes inspector general who was to oversee $2 trillion stimulus spending,* The Washington Post (April 7, 2020), https://www.washingtonpost.com/national-security/trump-removes-inspector-general-who-was-to-oversee-2-trillion-stimulus-spending/2020/04/07/2f0c6cb8-78ea-11ea-9bee-c5bf9d2e3288_story.html.
38. 38 Robert A. Westbrooks, Pandemic Response Accountability Committee, https://pandemic.oversight.gov/about/prac/members/robert-a-westbrooks.
39. 39 § 15010(d).
40. 40 § 15010(g).
41. 41 § 15010(e)(2).
42. 42 § 15010(e-f).
43. 43 § 15010(e)(3)(A)(ii).
44. 44 § 15010(e)(3)(c).
45. 45 § 15010(d)(1)(B)(x).
46. 46 § 15011(b).
47. 47 Pandemic Response Accountability Committee, https://pandemic.oversight.gov/.
48. 48 *See* "COVID-19_Report.xls" at https://pandemic.oversight.gov/track-the-money/contracts.
49. 49 *See* https://pandemic.oversight.gov/track-the-money/contracts
50. 50 § 4018(b).
51. 51 § 4018(c).
52. 52 § 4018(f).
53. 53 § 4018(e)(3).
54. 54 § 4018(e)(4).
55. 55 § 4018(d)(1).
56. 56 Morton Rosenberg, *When Congress Comes Calling,* The Constitution Project at 111 (May 23rd, 2017), https://archive.constitutionproject.org/wp-content/uploads/2017/05/Chapter-9.pdf.
57. 57 5a U.S.C. § 6(a)(4).
58. 58 Brian D. Miller - Department of the Treasury, Congress.gov (last updated June 2, 2020), https://www.congress.gov/nomination/116th-congress/1715.
59. 59 Roll Call Vote 116th Congress-2nd Session, United States Senate (June 2, 2020), https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=116&session=2&vote=00107.
60. 60 H.R. 935.
61. 61 H.R. 935 § 3.
62. 62 H.R. 935 § 4.
63. 63 *See e.g.*, Jeremy Diamond and Allie Malloy, *Trump at war with Democrats: "We're fighting all the subpoenas",* CNN (April 24th, 2019), https://www.cnn.com/2019/04/24/politics/donald-trump-fight-subpoenas-don-mcgahn-ridiculous/index.html.
64. 64 *House Coronavirus Panel Demands that Large Public Corporations Return Taxpayer Funds Intended for Small Businesses*, Select Subcommittee on the Coronavirus Crisis (May 8, 2020), https://coronavirus.house.gov/news/letters/letter-ceo-tim-abood-evo-transportation-energy-services-inc.
65. 65 *Scalise Slams Dems For Partisan Select Committee Action*, Office of Congressman Steve Scalise (May 8, 2020), https://scalise.house.gov/media/press-releases/scalise-slams-dems-partisan-select-committee-action.
66. 66 *Company Returns $10 Million in Taxpayer Funds Intended for Small Businesses in Response to Select Subcommittee Inquiry*, Office of Congressman Andy Kim (May 11, 2020) https://kim.house.gov/media/press-releases/company-returns-10-million-taxpayer-funds-intended-small-businesses-response
67. 67 *See e.g.*, https://www.globenewswire.com/news-release/2020/05/09/2030693/0/en/Statement-of-EVO-Transportation-Energy-Services-Inc-Regarding-PPP.html; https://www.cbsnews.com/news/quantum-corp-paycheck-protection-program-loan-funds-keeping/; https://www.gulfisland.com/news-media/press-releases/detail/219/gulf-island-reports-first-quarter-2020-results.
68. 68 https://www.republicanwhip.gov/wp-content/uploads/2020/05/2020-0511-Universal-Stainless-and-Alloy-Products-Letter.pdf
69. 69 *Select Subcommittee Launches Investigation Into Disbursement of PPP Funds,* Select Subcommittee on the Coronavirus Crisis (June 15, 2020), https://coronavirus.house.gov/news/press-releases/select-subcommittee-launches-investigation-disbursement-ppp-funds.
70. 70 https://coronavirus.house.gov/news.
71. 71 Clyburn and Maloney Seek Copies Of Contracts For Coronavirus Vaccine Development, Select Subcommittee on the Coronavirus Crisis (June 2nd, 2020), https://coronavirus.house.gov/news/press-releases/clyburn-and-maloney-seek-copies-contracts-coronavirus-vaccine-development.
72. 72 Letter from James E. Clyburn and Carolyn B. Maloney to Secretary of Health and Human Services Alex Azar (June 2nd, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-06-

02.Clyburn%20CBM%20to%20HHS%20re%20Vaccine%20and%20Treatment%20Contracts.pdf.

73. 73 *March Oversight Report: The Final Report of the Congressional Oversight Panel*, Congressional Oversight Panel (March 16, 2011) at 184.

74. 74 *Id*.

75. 75 *See e.g.,* Gustavo Grullon, Yelena Larkin and Roni Michaely, *Are US Industries Becoming More Concentrated?,* University of Toronto Economics Seminar Paper 70104 (October 2016), https://www.economics.utoronto.ca/index.php/index/research/downloadSeminarPaper/70104; Jose A. Azar et al., *Concentration in US Labor Markets: Evidence From Online Vacancy Data,* National Bureau of Economic Research Working Paper 24395 (February 2019), https://www.nber.org/papers/w24395.pdf.

76. 76 Aaron Klein and Camille Busette, *Improving the equity impact of the Fed's municipal lending facility,* The Brookings Institution (April 14, 2020), https://www.brookings.edu/research/a-chance-to-improve-the-equity-impact-of-the-feds-municipal-lending-facility/.

77. 77 Christopher Condon and Amanda Albright, *Fed Expands Muni-Debt Program to Cover Smaller Cities, Counties,* Bloomberg (April 27, 2020), https://www.bloomberg.com/news/articles/2020-04-27/fed-lowers-population-thresholds-for-municipal-debt-program.

78. 78 Congressional Oversight Panel Final Report at 157.

79. 79 Danny Werfel, *Fighting fraud in the CARES Act-Rebuild the 'ROC',* The Hill (April 22, 2020), https://thehill.com/opinion/technology/493877-fighting-fraud-in-the-cares-act-rebuild-the-roc.

80. 80 Congressional Oversight Panel Final Report at 157.

81. 81 *Id*.

82. 82 Memorandum from Deborah L. Harker, Assistant Inspector General for Audit, *Interim Audit-Update – Coronavirus Relief Fund Recipient Reporting,* Department of the Treasury Office of the Inspector General, at 3(May 27, 2020), https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-20-036.pdf.

83. 83 *Id. at* 4.

84. 84 CARES Act, Division A

85. 85 Jonathan O'Connell et al, *Treasury, SBA Data show small-business loans went to private equity-backed chains, members of Congress,* Washington Post (July 6, 2020), https://www.washingtonpost.com/business/2020/07/06/sba-ppp-loans-data/.

86. 86 Letter from Frederick W. Vaughan, Principal Deputy Assistant Secretary, Office of Legislative Affairs, Department of the Treasury to Representative Carolyn Maloney, Chairwoman, Committee on Oversight and Reform (July 2, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-07-02%20UST%20Letter%20to%20CW%20Maloney.pdf.

87. 87 Jory Heckman and Jason Miller, *Recovery Board's roadmap would suit pandemic oversight panel just fine, experts say*, Federal News Network (April 9, 2020) https://federalnewsnetwork.com/agency-oversight/2020/04/recovery-boards-roadmap-would-suit-pandemic-oversight-panel-just-fine-experts-say/

88. 88 Christy Goldsmith Romero, *SIGTARP Semiannual Report to Congress*, Office of the Special Inspector General for the Troubled Asset Relief Program (March 2020) https://www.sigtarp.gov/Quarterly%20Reports/April_30_2020_Report_to_Congress.pdf#page=2

89. 89 One individual in Georgia was charged with bank fraud after using $1.5 million in PPP loans to buy personal items rather than paying workers. *See* Jonathan O'Connell, *Reality star charged with sending funds from federal small business program on jewelry, Rolls-Royce*, The Washington Post (May 16, 2020) https://www.washingtonpost.com/business/2020/05/16/reality-star-charged-with-spending-funds-federal-small-business-program-jewelry-rolls-royce/.

90. 90 Congressional Oversight Panel Final Report at 191.

91. 91 Lauren Hirsch and Jacob Pramuk, *Trump administration releases list of companies that received most money from small business bailout loans,* CNBC (July 6, 2020), https://www.cnbc.com/2020/07/06/coronavirus-stimulus-list-of-ppp-small-business-loan-recipients-released.html.

92. 92 *Id.*

93. 93 Caleb Melby and Shahien Nasiripour, *Trump's Waikiki Partner, Kushner Family Among PPP Borrowers,* Bloomberg (Updated on July 7, 2020), https://www.bloomberg.com/news/articles/2020-07-06/trump-s-waikiki-partner-devos-tied-company-among-ppp-recipients.

94. 94 *Id.*

95. 95 *Id.*

96. 96 *Id.*

97. 97 *Id.*

98. 98 Jack Gillum et al, *Trump Friends and Family Cleared for Millions in Small Business Bailout,* ProPublica (July 6, 2020), https://www.propublica.org/article/trump-friends-and-family-cleared-for-millions-in-small-business-bailout.

99. 99 *Id.*

100. 100 *Id.*

101. 101 *Id.*

102. 102 *Id.*

103. 103 Brian Schwartz, *Companies with Trump ties got coronavirus small business loans*, CNBC (July 7, 2020), https://www.cnbc.com/2020/07/07/coronavirus-small-business-relief-companies-with-trump-ties-got-ppp-loans.html.

104. 104 *Id.*

105. 105 *Id.*

106. 106 Brian Slodysko and Angeliki Kastanis, *Trump donors among early recipients of coronavirus loans,* AP News (July 7, 2020), https://apnews.com/00a34243825661313f2cb6a0f6a21720.

107. 107 *Id.*

108. 108 *Id.*

109. 109 *Id.*

110. 110 *Id.*

111. 111 Elana Schor, *Virus loans helped entities tied to Trump evangelical allies,* AP News (July 7, 2020), https://apnews.com/88a957426a09eb3b7db2dbceeffa25c0.

112. 112 *Id.*

113. <u>113</u> *Id.*

114. <u>114</u> *Id.*

115. <u>115</u> Karl Evers-Hillstrom, *Company that gave six figures to pro-Trump super PAC got PPP loan worth at least $5 million,* Center for Responsive Politics (July 7, 2020), <u>https://www.opensecrets.org/news/2020/07/company-that-gave-six-figures-to-pro-trump-super-pac-got-ppp-loan-over-5-million/.</u>

Exhibit 5:      Alexander Bolton, *Battle brewing on coronavirus relief oversight*,
The Hill, (July 15, 2020)



# Battle brewing on coronavirus oversight

BY **ALEXANDER BOLTON** - 07/15/20 06:00 AM EDT

**263** SHARES

 

Just In...

### Facebook offers $650 million to settle facial recognition suit
TECHNOLOGY — 11M 37S AGO

### Trump goes all in on Florida
CAMPAIGN — 13M 37S AGO

### Colorado bars and restaurants sue governor over 'no alcohol after 10 p.m.' rule
STATE WATCH — 16M 23S AGO

### Marine assigned to Trump's helicopter squadron tests positive for COVID-19
DEFENSE — 20M 18S AGO

### Incentivize innovations that make telemedicine indispensable amid COVID
OPINION — 20M 37S AGO

### Stocks slump on rising US-China tensions, tech sell-off
FINANCE — 20M 41S AGO

### Fauci: 'I certainly don't think we're near the end of this'
ADMINISTRATION — 25M 16S AGO

### US confirms fighter flew close to Iranian passenger plane to 'inspect it'
DEFENSE — 38M 5S AGO



This video will resume in 30 seconds

A lack of oversight for more than $2 trillion in COVID-19 spending approved by Congress is creating uncertainty about whether relief programs are working as planned, adding a new layer of complications to the next coronavirus package.

The three independent oversight panels set up by Congress in the bipartisan CARES Act almost four months ago have all encountered serious obstacles — sometimes because of resistance from the White House, other times due to drafting oversights in the authorizing legislation.

As a result, lawmakers and the public may not have a full understanding of how coronavirus relief aid is being spent until after the election. In the meantime, Congress and the White House are moving toward another pandemic bill that's expected to carry a price tag of at least $1 trillion.

One of the latest flashpoints to emerge is implementation of the $660 billion Paycheck Protection Program (PPP), an initiative designed to extend forgivable loans to small businesses during the pandemic to keep workers on the payroll.

"We don't have a full picture from the information that we've received so far, so it's hard to say whether the program is working," said Liz Hempowicz, director of public policy at the Project on Government Oversight, a watchdog group.

She said recently released government figures for the program are inadequate.

**VIEW ALL**

Related News





Unions, liberal groups
list demands for next...



Graham: 'We don't have
a Dr. Fauci problem'



Cornyn, Klobuchar
introduce bill to give...



The Most Comfortable
Face Masks You Can...
Sponsored | Jaanuu Antimicrobial-
Finished Face Masks

"In the PPP loan data, the administration is claiming that they know how many jobs have been retained under this program and how many jobs have been saved, but there's no way for the government to know that," she said, noting that the numbers just represent "how many people are employed by those entities that got these loans rather than how many jobs have been supported by this program."

The CARES Act, signed into law on March 27, set up three oversight arms: the special inspector general for pandemic recovery (SIGPR), tasked with overseeing coronavirus spending; the Pandemic Response Accountability Committee, an interagency panel designed to promote cooperation among the various inspectors general; and a special Congressional Oversight Commission.

Each entity quickly encountered hurdles.

The Pandemic Response Accountability Committee has not received the spending data that some lawmakers thought it would when they voted for the CARES Act, which mandated that PPP recipients report in detail how many jobs were saved or created because of federal assistance.

For the SIGPR, staffing up is a problem. The inspector general doesn't have the authority to speed up the lengthy government hiring process.

Critics also argue that while the SIGPR has subpoena power, it has limited authority over criminal matters. While it can issue search warrants, the SIGPR must refer criminal activity to the Justice Department for prosecution.

President Trump undercut the oversight process from the get-go when he attached a signing statement to the CARES Act declaring his administration would not allow the SIGPR to issue reports to Congress "without presidential supervision."

Trump also blocked Glenn Fine, the then-acting inspector general of the Defense Department, from serving as chairman of the Pandemic Response Accountability Committee, a move that critics warned could be seen as having a chilling effect on the panel's independence.

The third oversight body, the five-member Congressional Oversight Commission, still doesn't have a leader, hampering its ability to staff up. Senate Majority Leader Mitch McConnell (R-Ky.) and Speaker Nancy Pelosi (D-Calif.) were reportedly eyeing former Joint Chiefs of Staff Chairman Gen. Joseph Dunford for the job, but he removed himself from consideration on Tuesday.



Get 6 months of
unlimited listening
with Spotify Premium

BY SAMSUNG

SPONSORED CONTENT

The lethargic pace of oversight has raised concerns about whether lawmakers have enough information about the programs they already passed as they head into negotiations over another coronavirus relief package.

Case 1:20-cv-02031-ABJ Document 1 Filed 07/24/20 Page 60 of 77

The PPP, which passed with broad bipartisan support in March and was bolstered by an infusion of $320 billion in April, is likely to receive renewed scrutiny following a series of negative headlines.

Recently released government data shows that lobbying and law firms and special interest groups in Washington received the small-business loans. Americans for Tax Reform, a special interest group that promotes smaller government, received between $150,000 and $350,000, while APCO WorldWide, a lobbying firm, received more than $5 million.

Bloomberg News reported Monday that a raft of data errors related to PPP funding have raised new questions about the emergency spending. The article cited a Tennessee business owner who was listed in government documents as having been approved for a $5 million loan even though he only received $3,700.

Lawmakers who oppose another relief bill have seized on the recent reports.

"What did folks expect when we spent $2 trillion of taxpayer money in three months? Of course there's going to be massive waste, fraud and abuse," said Rep. Thomas Massie (R-Ky.), who tried to hold up the CARES Act in the House in March.

Hempowicz said one major problem in overseeing the PPP loans arose in April when the White House budget office, led at the time by Russell Vought in an acting capacity, issued guidance informing agencies that the reporting requirements under the Federal Funding and Accountability Act were sufficient.

Sen. Rob Portman (R-Ohio) raised the issue with Vought during his confirmation hearing last month.

Portman said Vought's guidance "seems to contradict what the legislation clearly says."

Opposition to another massive spending bill is also growing among Senate Republicans who are concerned about the soaring federal deficit amid reports that billions of dollars in coronavirus relief isn't helping the most vulnerable.

"Conservatives are upset because this oversight is even worse than the oversight for TARP. Money is going to entities that don't deserve it and it's been a disaster in that sense," said Brian Darling, a Republican strategist and former Senate aide, referring to the Troubled Asset Relief Program (TARP) Congress passed in response to the financial crisis in 2008.

"If they try and do another program like the PPP, where they're just throwing money out there without strong requirements about who can qualify, it's going to be another mess," he added. "If you go to some of the conservative meetings, people are harkening back to TARP."

Republican Sens. Pat Toomey (Pa.), Ron Johnson (Wis.) and John Cornyn (Texas) are among those raising concerns about adding to the deficit when hundreds of billions of dollars in funds already appropriated remain unspent and Congress is still trying to grasp just how much the aid delivered has helped the economy.

Toomey is warning against loading up what he calls the "money cannon" and told business owners in Harrisburg, Pa., last week that he was "skeptical" about another round of stimulus checks because "it was a

massive amount of money, not at all targeted to the people who really needed it."

The stimulus check program included in the CARES Act came under criticism when the Government Accountability Office reported last month that $1.4 billion in direct payments went to dead people. Most of the money, though, went to individuals making less than $100,000 a year.

Democratic senators led by Sens. Elizabeth Warren (Mass.) and Richard Blumenthal (Conn.) say the anti-corruption provisions included in the CARES Act need to be strengthened.



**Majority back more COVID-19 relief from Congress in Florida, Georgia...**

**To boost recovery, Congress must evaluate regulatory reforms**

They sent a letter to congressional leaders in late April calling for new legislation to empower the inspectors general overseeing the trillions appropriated so far, as well as language to address potential conflicts of interest and protect whistleblowers.

But as Senate Republicans and the White House move forward in crafting what's likely to be the last coronavirus relief bill before the election, Democrats aren't holding their breath on a measure that mandates robust oversight.

"At every opportunity President Trump has weakened and stymied efforts by Congress and independent watchdogs to ensure that trillions in taxpayer dollars are being spent effectively and appropriately," Senate Minority Leader Charles Schumer (D-N.Y.) said in a statement Monday. "Senate Republicans, afraid of President Trump's wrath, have turned a blind eye to the administration's failures and mismanagement of the COVID-19 crisis."

TAGS  ELIZABETH WARREN  MITCH MCCONNELL  CHARLES SCHUMER  THOMAS MASSIE  NANCY PELOSI  DONALD TRUMP  RON JOHNSON  ROB PORTMAN  JOHN CORNYN  PAT TOOMEY  CORONAVIRUS



| f SHARE | 🐦 TWEET | → |
|---------|----------|---|

THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE ©2020 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.

Exhibit 6:      Friends of the Earth report,
*Cashing in on COVID: Tax Breaks, Royalties and Stimulus Loans*



# Cashing in on COVID: Tax Breaks, Royalties and Stimulus Loans

by Lukas Ross, Senior Policy Analyst at Friends of the Earth, lross@foe.org

As the US continues to lead the world in COVID-19 infections and deaths, Big Oil is looking to cash in on the policy response to the crisis. While frontline workers make due without hazard pay or protective gear, the domestic oil and gas industry is using its considerable lobbying muscle to secure a massive windfall at the expense of workers, taxpayers and the climate. Big Oil is not letting the coronavirus go to waste.

## HIGHLIGHTS

 At least 11 oil and gas companies and trade associations reported lobbying on tax issues in the Coronavirus Aid, Relief, and Economic Security (CARES) Act, the $2.2 trillion stimulus package passed in March. The filings indicate that tax policy was Big Oil's largest single intervention in stimulus negotiations.

 This lobbying blitz seems to have been rewarded with over $100 billion in tax cuts that disproportionately benefit the industry, especially companies like Halliburton that reported losses last year and companies like ExxonMobil beginning to report losses this year. These new giveaways are in addition to $16 billion in annual direct subsidies for oil and gas.

 The Independent Petroleum Association of America, the political arm of the fracking industry, reported lobbying one of the main banking regulators in the US, the Office of the Comptroller of the Currency, regarding coronavirus relief. This is a strong sign that heavily indebted drillers are seeking laxer lending standards to weather the crisis.

 ExxonMobil and Occidental Petroleum -- the largest and fourth largest oil companies in the US -- both reported lobbying for the 45Q tax credit, a subsidy that mainly incentivizes using captured $CO_2$ to stimulate oil production. Although the IRS Inspector General recently found that nearly $1 billion in credits had been fraudulently claimed under the current law, Senate Republicans recently demanded that the tax credit be expanded and made permanent as part of the next coronavirus stimulus.

 The Interior Department has begun the process of granting royalty relief, reducing or perhaps eliminating entirely the share due to taxpayers for oil and gas extracted from public lands and waters. This reflects lobbying pressure from at least two major trade associations.

## INTRODUCTION

Friends of the Earth reviewed over 100 lobby filings from prominent US oil and gas companies and their largest trade associations, released last month as part of the quarterly filing requirements under the Lobbying Disclosure Act. The results show that Big Oil has already benefited substantially from the initial policy responses to the coronavirus -- and that it continues to shape policy outcomes to secure a windfall for itself.

Unfortunately, these filings are almost certainly an incomplete picture of the conversations happening behind closed doors between Big Oil, members of Congress and the Trump administration. What's more, they represent only a snapshot in time this year from January 1 to March 31. Nevertheless, they are the only available picture to date of Big Oil's lobbying activity on the coronavirus -- and the picture they paint is of disaster capitalism at its worst.

## TAX BREAKS

Oil and gas companies and their trade associations lobbied more heavily for tax cuts than any other issue around the CARES Act. Although the legislation is mainly associated with $1,200 checks to individuals and a $500 billion slush fund for corporations, the package also included over $591 billion in tax cuts. A closer look at these tax cuts reveals that Big Oil stands out as a significant beneficiary.

The story begins in 2017, when Trump signed into law his massive $1.5 trillion tax cut. Because Big Oil was able to protect its numerous special interest deductions and benefit from the overall lowering of corporate rates, it emerged from tax reform as one of the clearest winners. At the time energy accountants only identified two new provisions potentially detrimental to the industry: a new cap on the amount of interest that could be deducted, and a new restriction capping the deduction for business losses and prohibiting those losses from being claimed against tax bills from previous years. [1]

---

[1] https://www.taxnotes.com/featured-analysis/news-analysis-tcjas-effects-oil-and-gas-investments/2018/07/20/28854

While Congress sprinted to pass the first coronavirus stimulus and Big Oil lobbied heavily for tax cuts, the final package modified and partially reversed two of the industry's only causes for complaint. At a cost of $13.39 billion to taxpayers, the CARES Act temporarily raises the interest deduction cap for 2019 and 2020 from 30% to 50% of income. Even more expensive, the CARES Act allows net operating losses from 2018, 2019 and 2020 to be deducted against income taxes paid over the last five years -- at a cost to taxpayers of $88 billion over the next two years.[2]

As companies like ExxonMobil, Marathon, and ConocoPhillips begin to announce historic losses, this last provision could be hugely profitable. It will allow money-losing corporate polluters a liquidity boost as they amend filings from previous years with losses incurred this year. This means that struggling oil companies are going to get checks in the mail from the IRS -- an extra desirable treat because this deduction covers several years before the Trump tax cuts when the corporate rate was substantially higher.

Curiously, the same treatment is allowed for losses incurred in 2018 and 2019, despite the fact those years obviously predate the coronavirus. This is good news for companies like Halliburton and Occidental who reported net losses in 2019.

While these are general benefits any company can claim, they disproportionately benefit companies facing losses and companies with substantial debt burdens -- which today describes oil and gas more than any other sector.[3] The sober accountants at Ernest and Young agree, saying that, "...many energy companies will find the business tax changes made by the CARES Act to be helpful."[4]

**The most prominent lobbying activities around the CARES Act and taxes include:**

- The three main trade associations of the oil and gas industry -- The American Petroleum Institute, the Independent Petroleum Association of America and The American Fuel and Petrochemical Manufacturers -- all reported lobbying directly around tax issues in the CARES Act. The firm Ogilvy Government Relations also reported similar tax lobbying around the CARES Act on behalf of its client, the American Petroleum Institute.

- Refining giant Phillips 66 lobbied directly around tax issues in the CARES Act. ExxonMobil engaged in additional lobbying through the firm of Hannegan Landau Poersch & Rosenbaum on tax issues in the CARES Act. Koch Industries lobbied specifically around "energy tax issues" in the CARES Act through the firm Capitol Tax Partners.

- Major drilling companies Conoco, QEP, Denbury, and Murphy all reported lobbying around tax issues in the CARES Act either directly or through lobbying firms.

- Major refiner Marathon Petroleum was the most specific in its filings, and reported lobbying around the "Section 163(j) temporary expansion" -- the precise section of the tax code that deals with the deduction cap for interest. Like the American Petroleum Institute, it also paid Ogilvy Government Relations to lobby around tax provisions in the CARES Act.

**"This means that struggling oil companies are going to get checks in the mail from the IRS -- an extra desirable treat because this deduction covers several years before the Trump tax cuts when the corporate rate was substantially higher."**



2 https://www.taxpolicycenter.org/taxvox/who-benefits-cares-act-tax-cuts
3 https://www.mckinsey.com/~/media/mckinsey/business%20functions/risk/our%20insights/covid%2019%20implications%20for%20business/covid%2019%20march%2030/covid-19-facts-and-insights-april-3.ashx, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/moody-s-oil-gas-drillers-face-daunting-debt-wall-in-next-4-years-57196039
4 https://taxnews.ey.com/news/2020-0786-cares-act-has-implications-for-the-energy-industry

## STIMULUS SLUSH FUND

The biggest single prize in the CARES Act for corporate polluters is the $454 billion corporate slush fund -- and Big Oil has wasted no time lobbying for special access to it. Managed through programs established by the Treasury and the Federal Reserve, the full amount can be increased in size through leverage to as much as $4.5 trillion.

Already the Trump administration is promising additional support from the stimulus for oil and gas, including potentially creating an entirely new program solely for the industry. Recently it bowed to pressure from the industry and changed the rules for the $600 billion Main Street Lending program, allowing companies to use these loans to refinance existing debt.[5] This matters substantially to the heavily indebted fracking industry, which has over $85 billion due in the next four years.[6]

In an initial clue of the coming bailout, the premier trade association of the fracking industry, the IPAA, reported lobbying the Office of the Comptroller of the Currency (OCC) around the CARES Act. This is a major federal agency responsible for regulating banks.

One possibility is that this lobbying was concerned with Section 4011 of the CARES Act. This provision allows the OCC to waive lending caps for banks. These rules were put in place to keep any single lender from exposing its balance sheet too recklessly to any single borrower. Waiving these standards could become a way for heavily indebted drillers to access additional credit, even at the expense of financial stability.

Another possibility is hinted at in a recent letter to Trump from House republicans demanding unmitigated access to stimulus funds for the oil and gas industry. The letter adds: "We also urge the Administration to take necessary steps to assure that the 2016 Office of the Comptroller of the Currency Energy Lending Guidelines do not in any way hinder or prohibit producers from obtaining loans."[7]

This is especially significant because the guidelines referenced in the GOP letter were designed to help banks evaluate the risk of lending to oil companies. Banks were advised to not just evaluate the risk of so-called "reserve-based lending," essentially loans taken out against future production, but to evaluate companies more holistically based on "total debt." Measuring the risk of Senior Loans, or loans repaid first in the event of bankruptcy, was now supposed to factor in the total amount of riskier and more junior debt holdings.[8]

Although very arcane, it matters substantially to the heavily indebted fracking industry. The IPAA's direct lobbying of the OCC is the strongest indication yet of the industry's pursuit of a two-pronged bailout strategy: first, through direct lending programs as part of the $454 billion stimulus funds, and second, through the relaxing of existing lending standards.

## The highlights of the stimulus lobbying include:

- The IPAA lobbied the Comptroller of the Currency on the CARES Act

- Fracking firm Range Resources hired FTI Consulting specifically to support, "Economic Stimulus Package assistance relating to the COVID-19 crisis."

- Fracking firm QEP lobbied directly on "loans and tax related matters" relating to the CARES Act.

- Fracking firm Noble Energy has engaged in direct lobbying around the CARES Act specifically for "provisions relating to Oil and Gas Industry Support."

- The refining giant Phllips 66 lobbied directly around "Transportation-related issues in draft stimulus legislation," presumably opposing incentives for electric vehicles.

## ROYALTY RELIEF

Royalty payments are the share of profits oil and gas companies must pay to the state and federal government for resources extracted from public lands and waters. Big Oil has been lobbying hard to reduce or suspend these royalty payments, and they have a friend in Secretary of the Interior David Bernhardt, a former oil lobbyist himself. This would be an especially brutal blow to local and state governments heavily dependent on royalty revenue for public services, especially in the Gulf Coast and in the West.

So far, the Interior Department has begun a case-by-case approach granting royalty relief both onshore and in the Gulf. However, Senate Republicans have pushed for Secretary Bernhardt to use his authority much more broadly to reduce or suspend royalties across the board.[9]

5 https://www.federalreserve.gov/monetarypolicy/files/main-street-lending-faqs.pdf
6 https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/moody-s-oil-gas-drillers-face-daunting-debt-wall-in-next-4-years-57196039
7 https://arrington.house.gov/2020/04/arrington-leads-letter-urging-support-for-oil-and-gas-industry/
8 https://www.haynesboone.com/-/media/files/alert-pdfs/2018/enforceability_of_occ_reserve_based_lending_guidelines.ashx?la=en&hash=B4B4CEC49268A92B63063BED61580B-C5F70575D9
9 https://www.reuters.com/article/us-global-oil-cassidy/trump-administration-turns-down-offshore-oils-plea-for-broad-royalty-cuts-cassidy-idUSKCN2243EB

## Lobbying activity of royalty relief has included:

- The Louisiana Mid-Continent Oil and Gas Association, a Gulf Coast trade association publicly supporting royalty relief, has hired Big Sky Bluewater Strategies to lobby on "economic incentives for offshore energy production in Gulf of Mexico."

- The IPAA, through its contract with the Alpine Group, has lobbied explicitly for "Federal Royalty Relief."

- Murphy Oil, a major producer in the Gulf of Mexico, has lobbied directly for offshore royalty relief.

## CROOKED TAX CREDITS?

As Congress begins to consider the next stimulus, Senators Cramer and Capito recently demanded that any support for renewable energy must be accompanied by an extension of the 45Q tax credit, a subsidy claimed almost exclusively by the oil and gas industry that incentivizes using captured $CO_2$ to stimulate additional production. Passed originally as part of the Wall Street bailout in 2008, it was extended and expanded a decade later in 2018. In February, before the coronavirus emergency was declared, House Minority Leader Kevin McCarthy had called for the subsidy to be expanded and made permanent.

The problem is that the Inspector General of the IRS released a recent report identifying major problems with the implementation of the 45Q tax credit. It indicates that the vast majority of credits were claimed by a handful of companies, and that 87% (nearly $1 billion) of the credits claimed under the law were done without the proper monitoring of where the captured $CO_2$ was being stored.[10]



## The lobbying highlights for the 45Q tax credit include:

- ExxonMobil paid the accounting firm Ernest and Young to lobby on its behalf around 45Q.

- Occidental Petroleum lobbied directly for the 45Q tax credit.

- Denbury Resources lobbied for the 45Q tax credit through the firm of Thomas Coburn LLP.

- The oilfield services giant Baker Hughes lobbied directly for the 45Q tax credit.

## CONCLUSIONS AND RECOMMENDATIONS:

The original coronavirus stimulus was passed quickly and in an emergency. As additional legislation to address the crisis is considered, it is important for Congress to both prioritize still unmet human needs while correcting previous mistakes.

Much more work needs to be done, both to support workers and families in the face of COVID-19 and to prevent a runaway bailout of the fossil fuel industry. Congress cannot afford to wait. As it returns to work and begins to develop the next relief package, it must:

- Prioritize direct aid to workers and communities on the frontlines of the crisis.

- Support the ReWIND Act from Senator Merkley and Representative Barragan, the most comprehensive anti-bailout legislation to date. It would stop fossil fuels from gaining access to stimulus lending, eliminate royalty relief, and ban additional purchases into the Strategic Petroleum Reserve.

- Repeal the tax breaks provided to Big Oil in the last package.

- Allow the 45Q tax credit to expire and do not include it as a trade in forthcoming stimulus packages.

   **Appendix. Friends of the Earth reviewed the Q1 lobbying filings of US-based oil and gas companies comprising the drilling, refining, midstream, and oilfield services sectors, as well as their associated national and regional trade associations. The full list of filings and direct links to them are available online here.**

10 https://www.menendez.senate.gov/imo/media/doc/04292020%20Menendez%20Letter%20to%20IRS%2045Q%20Follow-Up.pdf


Friends of the Earth

Exhibit 7:    Friends of the Earth report, *The Big Oil Money Pit: How $750 billion in new stimulus spending could prop up failing polluters*

# THE BIG OIL MONEY PIT:

**How $750 billion in new stimulus spending could prop up failing polluters**

- The Federal Reserve has just announced $750 billion in corporate debt-buying as part of funding made available through the stimulus.
- ExxonMobil, Chevron and Conoco are together eligible for a maximum **$19.4 billion** in benefits, based on their credit ratings and outstanding long-term debt,
- There are 12 fracking-focused oil and gas companies that could potentially qualify for the new program. Together, they may be eligible for over **$24.1 billion** in potential benefits.
- Major fracking company Continental Resources, whose debt was recently downgraded to below investment grade by S&P, is potentially eligible for as much as **$1.5 billion** under new, weaker standards announced by the Federal Reserve.
- As BlackRock begins purchasing "high yield" exchange-traded funds (ETFs) to bolster corporate debt markets, energy companies (predominantly oil and gas) stand to benefit disproportionately as the largest single issuer of junk bonds, at 11% of the entire US market.

## INTRODUCTION

Last month, as the COVID-19 pandemic gained speed and the economy ground to a halt, Congress rushed through a $2 trillion economic stimulus package. It passed 96-0 in the Senate and by a unanimous voice vote in the House. As he signed the legislation into law, Donald Trump publicly promised to ignore key safeguards supervising how the money would be spent.[1]

The largest single expenditure was a $500 billion corporate slush fund. Of that amount, Treasury Secretary Steven Mnuchin enjoys direct control over a comparatively small $46 billion reserved for aviation and industries deemed essential to "national security." But the remaining $454 billion went to the Federal Reserve, which will use the money to implement emergency lending programs for corporations and municipalities. Secretary Mnuchin must approve these lending programs and wields considerable power over their design, but the money itself will move through the Fed.[2]

After weeks of unprecedented human suffering and an ongoing failure to support frontline workers, the Fed announced on April 9, 2020 how it would spend the first $195 billion of the slush fund. A full $75 billion would go to buy corporate debt. But because the Fed can leverage money appropriated by Congress, the real size of this program is $750 billion.[3] Considering that a majority of the money from the first stimulus still unspent, there is plenty of room for this program to grow.

There are strong indications that as these programs are deployed, they will function as a bailout for the fossil fuel industry.

## BONDS 101

One of the most common ways for large corporations to raise capital is by issuing bonds. Bonds are essentially long-term debt obligations that promise a fixed return on investment. The company issuing the bond pays interest to the bondholder over the course of the loan, and then pays the full amount when the bond comes due. Like many other financial products, the value of bonds can fluctuate as they are traded back and forth on secondary markets.

Not all bonds are created equal. Some companies are financially healthier than others, which affects their ability to borrow and the value of their existing debt. Making these determinations about financial health are credit rating agencies, which score companies on whether their debt is "investment grade" or more speculative "junk." The so-called Big Three credit rating agencies are Moody's, S&P and Fitch, and these are how they rate companies:

---

1. https://www.whitehouse.gov/briefings-statements/statement-by-the-president-38/
2. See CARES Act, Section 4003.
3. https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20200409a5.pdf

| Investment grade | Moody's | Standard & Poor's | Fitch |
|---|---|---|---|
| Strongest | Aaa | AAA | AAA |
| | Aa1 | AA+ | AA+ |
| | Aa2 | AA | AA |
| | Aa3 | AA- | AA- |
| | A1 | A+ | A+ |
| | A2 | A | A |
| | A3 | A- | A- |
| | Baa1 | BBB+ | BBB+ |
| | Baa2 | BBB | BBB |
| | Baa3 | BBB- | BBB- |
| Non-investment-grade | Moody's | Standard & Poor's | Fitch |
| | Ba1 | BB+ | BB+ |
| | Ba2 | BB | BB |
| | Ba3 | BB- | BB- |
| | B1 | B+ | B+ |
| | B2 | B | B |
| | B3 | B- | B- |
| | Caa1 | CCC+ | CCC+ |
| | Caa2 | CCC | CCC |
| | Caa3 | CCC- | CCC- |
| | Ca | CC | CC |
| Weakest | Moody's | Standard & Poor's | Fitch |
| | C | C | C |
| | | D | D |

(Source: Fidelity Learning Center)

## ENTER THE FED

The $750 billion available through the Fed is meant to support the economy by purchasing massive amounts of corporate debt. The total amount of money is technically shared between two separate programs: **the Primary Market Corporate Credit Facility (PMCCF) and the Secondary Market Corporate Credit facility (SMCCF).**

The PMCCF allows companies to issue new bonds that the Fed then directly purchases. This is a novel way of injecting corporations with emergency money. A company gets cash and the Fed gets debt, to be repaid in at most four years.

The SMCCF allows bonds to be purchased from secondary markets and stored in the relative safety of the Fed's balance sheet. It also allows the purchase of shares in so-called "high yield" exchange-traded funds, or ETFs. These are basically investment funds that pool together the debt of comparatively risky companies. They are designed to provide investors with broad exposure to bonds that fall below the standard of investment grade. This piece of the program is being administered by BlackRock, the largest asset manager on earth, the largest player in the ETF market, and the largest owner of fossil fuels on the planet.

### Here are some of the most important conditions associated with PMCCF and SMCCF:

- No company may issue bonds for the Fed to purchase that exceed 130% of their outstanding debt obligations.
- No company may have more than 10% of its outstanding debt purchased from a secondary market by the Fed.
- No ETF may have more than 20% of its outstanding shares purchased by the Fed
- No single company is allowed to account for more than 1.5% of the total $750 billion combined size of the PMCCF and SMCCF.

Perhaps most important of all, the Fed has stipulations about the financial health of individual companies allowed to participate. It cannot use stimulus funds to purchase bonds unless they are considered investment grade by at least two major ratings companies. However, there is an exception. Companies that were investment grade on March 22, 2020 and subsequently downgraded can still benefit if at the time of purchase they hold at least two ratings no lower than BB- or Ba3. This is essentially a loophole allowing for the purchase of junk.

It is important to note that this exception for junk bonds already represents a relaxing of the Fed's original standards. Although the PMCCF and the SMCCF programs have been super-charged with money from the stimulus, they were both technically established by the Fed and the Treasury Department in March before the stimulus even became law. The original terms for both programs were considerably more strict. There was no exception for companies that had fallen into the junk range, and instead of allowing companies to issue bonds up to 130% of outstanding debt, there was a sliding scale that allowed companies on the lower end of investment grade to qualify for only 110%. Purchases of bonds below BBB- or Baa3 were expressly forbidden.[4]

## STIMULATING BIG OIL?

Long before the coronavirus, the oil and gas industry was struggling. The five largest supermajor oil companies have been living beyond their means, spending a massive $216 billion more on their shareholders through dividends and buybacks than they managed to raise in profits over the last decade.[5]

Although the climate and environmental risks of hydraulic fracturing have long been known to grassroots activists, Wall Street is becoming slowly aware that the practice is also financially ruinous. According to an analysis of 34 major fracking companies conducted by the Institute for Energy Economics and Financial Analysis, the sector has almost never generated positive cash flow. Between 2017 and 2019, it was spending more than it was bringing in to the tune of $25.9 billion.[6]

The economics of fossil fuels have never looked worse. And yet, just as Wall Street may be finished with fracking, the new stimulus programs from the Trump Administration could be a massive lifeline. Here's how:

## BIG OIL WINS BIG

The biggest potential beneficiaries of the Fed's programs are unsurprisingly the biggest companies who entered the crisis with the most stability. ExxonMobil, Chevron and Conoco all had investment grade ratings across the board and have so far maintained them as the crisis unfolds. Using their long-term debt as a proxy, Friends of the Earth estimates that ExxonMobil potentially qualifies for $7.9 billion, Chevron qualifies for $7.1 billion, and Conoco qualifies for $4.4 billion. That means that taken together these large companies are potentially eligible for a combined total of $19.4 billion in benefits.[7]

## A FRACKING BAILOUT?

In spite of the fracking industry's considerable economic headwinds, there are still at least 12 oil and gas companies heavily invested in fracking that could potentially qualify for debt purchases under the new Fed program. Using the long-term debt of these companies as a proxy for their total debt obligations, Friends of the Earth estimated their total potential benefits. The companies, their credit ratings, their long-term debt as reported to investors, and their maximum eligibility for Fed support are listed below:

| Company | S&P Rating | Moody | Fitch | Total Long-Term Debt 31 December 2019 | Total eligible amount |
|---|---|---|---|---|---|
| Apache | BB+ | Baa3 | BBB | 8,555,000,000 | $2,566,500,000 |
| Cimarex Energy Co. | BBB- | Baa3 | N/A | 2,000,000,000 | $600,000,0000 |
| Concho Resources Inc. | BBB- | Baa3 | BBB | 3,955,000,000 | $1,186,500,000 |
| Continental Resources Inc. | BB+ | Ba1 | BBB- | 5,326,514,000 | $1,597,954,200 |

4    https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20200323b1.pdf
5    https://ieefa.org/ieefa-update-oil-majors-paid-216-billion-more-to-shareholders-than-they-earned-directly-from-business-over-the-past-decade/
6    https://ieefa.org/wp-content/uploads/2020/03/Shale-Producers-Spilled-2.1-Billion-in-Red-Ink-Last-Year_March-2020.pdf
7    This calculation for the total PMCCF cap was calculated from their long-term debt reported in SEC filings. Chevron, ExxonMobil, and Conoco had $23.691 billion, $26.342 billion, and $14.790 billion respectively.

| | | | | | |
|---|---|---|---|---|---|
| Devon Energy Corporation | BBB- | Ba1 | BBB | 4,294,000,000 | **$1,282,200,000** |
| Diamondback Energy Inc. | BBB- | Ba1 | BBB | 5,371,000,000 | **$1,611,300,000** |
| Encana/Ovintiv | BBB- | Ba1 | BBB- | 6,974,000,000 | **$2,092,200,000** |
| EOG Resources Inc. | A- | A3 | N/A | 4,160,919,000 | **$1,248,275,700** |
| Hess Corporation | BBB- | Ba1 | BBB- | 7,142,000,000 | **$2,142,600,000** |
| Noble Energy Inc. | BBB- | Baa3 | BBB | 7,477,000,000 | **$2,243,100,000** |
| Marathon | BBB- | Baa3 | BBB | 5,501,000,000 | **$1,650,300,000** |
| Pioneer Natural Resources Company | BBB | Baa2 | BBB | 1,839,000,000 | **$551,700,000** |
| | | | | | **$24,172,629,900** |

One company to note is fracking pioneer Continental Resources. It was affirmed by Fitch as BBB- on March 20, 2020, putting it barely within investment grade. But it is currently rated by S&P at BB+, or just barely below investment grade. Together with its recently confirmed Ba1 from Moody's,[8] the company should be ineligible for Fed support because it has two junk ratings from two major rating agencies. However, because it was only downgraded to junk by S&P on March 27, 2020,[9] it qualifies as an exception to the Fed's rule.

For a company like Occidental, the shoe is on the other foot. Still one of the largest oil producers in the country, it assumed massive liabilities last year to acquire fellow oil giant Anadarko. But it was downgraded to junk by both Fitch and Moody's before the March 22, 2020 cutoff, with S&P following suit not long after the deadline.[10] Unless the Fed and Treasury modify the standards of the program, Occidental cannot issue bonds for the Fed to buy and the Fed cannot buy Occidental's bonds from secondary markets.

One thing to keep in mind is that companies benefitting from these debt purchases are exempt from a key provision of the stimulus. In theory, companies receiving direct loans from the Fed cannot engage in stock-buybacks until one year after the loan is repaid. Although Secretary Mnuchin always had the authority to waive this requirement, this condition apparently does not apply at all to the bond-buying programs.[11] That means that a company could issue bonds for purchase by the Fed, plow the resulting cash into stock-buybacks that enrich shareholders, and not be outside of the law.

## BLACKROCK'S BIG BAILOUT?

Many companies involved in fracking are still too risky for a bailout from the Fed. For example, major mid-size drilling companies like Antero, SM Energy, Highpoint, Callon and EQT were all downgraded by Moody's in March or early April of 2020, but these cuts dropped them from junk to even deeper junk.[12]

Unfortunately, there is another way for these cash-strapped drillers to receive help from the Fed, albeit indirectly. Because the junk bond market is now 11% energy companies (predominantly oil and gas),[13] any attempt to bolster the entire sector is going to benefit heavily indebted frackers. So now that BlackRock has broad authority to purchase junk or "high yield" ETFs to back-stop the market, the owners and issuers of that junk potentially stand to benefit -- even if they are currently ineligible for the Fed's other debt buying programs.

Take a particularly large high yield ETF managed by BlackRock -- for example, iShares iBoxx $ High Yield Corporate Bond ETF, which can be found using the ticker HYG for short.[14] This is a financial product designed to approximate exposure to the

8   https://markets.businessinsider.com/news/bonds/continental-resources-inc-moody-s-affirms-continental-s-ba1-ratings-outlook-stable-1029028812

9   https://www.marketwatch.com/story/continental-resources-suspends-dividend-to-cut-production-by-about-30-2020-04-07

10  https://finance.yahoo.com/news/occidental-becomes-biggest-fallen-angel-133028380.html

11  https://www.brookings.edu/research/explaining-the-new-fed-treasury-emergency-fund/

12  https://www.moodys.com/research/Moodys-downgrades-Antero-Resources-CFR-to-B3-notes-to-Caa1--PR_421782
    https://www.moodys.com/research/Moodys-downgrades-SM-Energys-CFR-to-B3-outlook-negative--PR_422239
    https://www.moodys.com/research/Moodys-downgrades-HighPoints-CFR-to-Caa2-outlook-negative--PR_422357
    https://www.moodys.com/research/Moodys-downgrades-Callon-Petroleums-CFR-to-B3-negative-outlook--PR_420376
    https://www.moodys.com/research/Moodys-downgrades-EQT-to-Ba3-outlook-remains-negative--PR_422015

13  https://www.ft.com/content/c048d870-6138-11ea-a6cd-df28cc3c6a68

14  See https://www.ishares.com/us/products/239565/ishares-iboxx-high-yield-corporate-bond-etf. Outstanding shares and values for HYG are current as of April 9, 2020

entire universe of junk bond debt issued by US companies. Unsurprisingly, many fracking companies are well represented.

There is thus considerable risk that this strategy to support junk debt ETFs could function as a back-door bailout for the accumulated bad debts of the fracking industry. For example, Chesapeake, which Moody's confirmed at a perilous Caa1 in January,[15] has $6.9 million worth of bonds contained within this ETF maturing in 2024 and 2025. Range Resources, which was downgraded in early April by S&P to a very risky B2,[16] is represented with $37.4 million in bonds maturing over the next six years.

Curiously, BlackRock could technically begin buying the 196 million current outstanding shares of this ETF to help bolster the corporate debt market overall. It would theoretically be limited by the 20% cap on the ownership of any single ETF. Although the shares would be stored on the Fed's balance sheet and BlackRock would waive its normal fee,[17] there is no escaping the fact that the world's largest asset manager is now empowered to use taxpayer funds to purchase its own products. This is a role similar to the one it played as a purchaser of toxic assets during the 2008 financial crisis.

## CONCLUSIONS AND RECOMMENDATIONS

The danger that Big Oil could benefit from existing stimulus programs is considerable. Unfortunately, it would not take additional legislation from Congress to super-charge the risk of a dirty energy bailout. The Treasury and the Fed already have broad discretion over the implementation of the stimulus, and could modify it to better suit polluters. For example, the Fed and Treasury could:

- Further loosen standards to support junk-rated companies, including fracking companies not currently eligible for aid.

- Create an entirely new Fed program with still unspent stimulus funds tailored to support either junk-rated companies in general or the oil and gas sector in particular.

The original coronavirus stimulus was passed quickly in an emergency. As additional legislation to address the crisis is considered, it is important for Congress to both prioritize still unmet human needs while correcting previous mistakes.

Much more work needs to be done, both to support workers and families in the face of COVID-19 and to prevent a runaway bailout of the fossil fuel industry. Congress cannot afford to wait. It must:

- Prioritize direct aid to still neglected workers and communities on the frontlines of the crisis.
- Engage in aggressive oversight to ensure BlackRock does not benefit unfairly from purchasing its own products or needlessly bolster fossil fuel assets.
- Eliminate Secretary Mnuchin's authority to waive crucial protections banning companies receiving bailouts stock buybacks.
- Make future stimulus aid conditional on new and binding protections for workers and the environment.
- Make oil, gas and coal companies ineligible for support from existing stimulus programs, unless it is conditioned on a phaseout of existing production and an iron-clad commitment to existing pension and environmental liabilities.

---

15      https://www.moodys.com/research/Moodys-changes-Chesapeake-Energys-Probability-of-Default-Rating-to-Caa1--PR_416663
16      https://www.moodys.com/research/Moodys-downgrades-Range-Resources-to-B2-outlook-negative--PR_421834
17      https://www.newyorkfed.org/medialibrary/media/markets/special_facilities/SMCCF_Terms_BlackRock.pdf

**Contact Information:**
Lukas Ross
Senior Policy Analyst
Friends of the Earth
lross@foe.org


Friends of the Earth

Exhibit 8:    Dino Grandoni, *The Energy 202: Oil industry lobbies to relax bank lending guidelines due to pandemic*, Wash. Post (Jan. 26, 2020)

The Washington Post

# PowerPost

**PowerPost** Analysis

# The Energy 202: Oil industry lobbies to relax bank lending guidelines due to pandemic

By Dino Grandoni

*with Paulina Firozi*

Oil and gas companies are putting pressure on the Trump administration to loosen bank guidelines put in place under President Barack Obama so they better access emergency loans during the coronavirus pandemic.

The oil and gas sector has been hit hard by the downturn in demand for gas and jet fuel as many people stay indoors during the viral outbreak. Many small to midsize petroleum producers see a little-known, four-year-old lending guidance document as obstructing the main goal of the stimulus packages passed by Congress — to keep workers employed and prevent companies such as theirs from going bankrupt.

"We're mainly trying to say: The train is moving out of the station. Let's make sure that there isn't a car at the back of the train that no one is paying attention to that could derail it," Lee Fuller, executive vice president at the Independent Petroleum Association of America (IPAA), the trade organization spearheading the lobbying effort, said in an interview.

But Lukas Ross of Friends of the Earth, an environmental group, called the request "a shameless attempt" to get a bailout from an industry already saddled with debt.

"Stimulus money is meant for communities and businesses hit hard by the coronavirus," Ross said. "It is not for oil companies drowning in debt from long before the crisis."

## At issue is an 86-page handbook published in 2016 for bank examiners, directing them to more closely scrutinize loans to oil and gas firms.

The Office of the Comptroller of the Currency (OCC), which regulates the nation's largest banks, wanted to keep a tighter leash on lending to petroleum producers when underground oil and gas reserves are used as collateral.

Back then, the banking regulator wanted to make sure petroleum producers would be able to pay back the loans. But now the guidelines could restrict the oil industry's access to emergency loans since much of that money is funneled through private banks subject to the 2016 guidance.

Four days after President Trump signed a $2 trillion coronavirus bill in March, Fuller emailed two OCC officials to explain why the IPAA, which represents small to midsize oil and gas producers, thought the Obama-era handbook may get in the way of them accessing the new emergency credit.

The trade group listed four sections of the manual it wanted the office to either revert to the 2014 version — or delete outright. The proposed changes included removing sections on how regulators assess a potential borrower's debt-to-earnings ratio, future cash flow and prices at which it can sell its crude oil and gas.

Taken together, the IPAA's proposal would give banks more flexibility in deciding which petroleum producers are creditworthy enough to get loans.

"Restoring the original provisions of the April 2014 Handbook would allow banks the discretion to make capital available prudently to domestic energy producers," Fuller wrote in the April 1 email, which was released to Friends of the Earth in response to a Freedom of Information Act request and shared with The Energy 202.

But Gregg Gelzinis, a senior economic policy analyst at the liberal think tank Center for American Progress, said the guidelines were put in place to protect banks from potential insolvency if oil prices crash. They worried reserve-based lending had gotten riskier for banks to do after a slide in oil prices between 2014 and 2016.

The changes the petroleum industry wants, Gelzinis added, "would permit banks to load up on more oil and gas risk, making it more likely that we have some bank failures down the line or at least weaken the position of some banks in the face of other oncoming losses from the coronavirus crisis."

"The brazenness of asking for line-item edits to the supervisor's manual," Gelzinis added, "just shows how emboldened industry lobbyists are in this environment."

## So far, the bank regulator has not acted on the oil and gas lobby group's suggestions.

OCC spokesman Bryan Hubbard wrote in an email that the office has not yet responded to the IPAA's request "and would not speculate on pending or potential policy actions."

The IPAA also raised its concerns with officials at both the White House and Energy Department, Fuller said. He added the IPAA "raised a lot of concerns about the way the guidelines were put together" at the end of Obama's presidency, to no avail.

The OCC is an independent regulator. While officially housed in the Treasury Department, Treasury Secretary Steven Mnuchin, who is running much of the economic relief effort, by law cannot interfere with OCC decisions, according to Gelzinis.

While nominally independent, the acting comptroller of the currency, Brian P. Brooks, took his temporary appointment in May and has echoed Trump's warnings that state and local shutdowns to stop the spread of the virus could harm the economy.

In a letter he sent this month to mayors and governors, Brooks wrote that "certain aspects of these orders potentially threaten the stability and orderly functioning of the financial system."

## It remains to be seen whether the Obama-era guidelines actually get in the way of getting emergency loans to oil and gas firms.

It was just last week when the Federal Reserve launched its new, $600 billion program to provide low-cost, government-backed loans to businesses with fewer than 15,000 workers.

Yet the program is off to a slow start. It is unclear whether enough private banks will participate. Under the program, firms apply through a bank, which can then sell 95 percent of the loan to the Fed.

The oil and gas companies, as well as Republican lawmakers from petroleum-producing states, have also leaned hard on the Fed for favorable terms for the emergency loans.

---

## Welcome to The Energy 202, our must-read tipsheet on energy and the environment.

**Sign up to receive the newsletter**

---

## Power plays

## The Trump administration is proposing to drill on more than two-thirds of the National Petroleum Reserve-Alaska.

The Bureau of Land Management said Thursday it wants to remove wildlife protections for the nearly 23 million-acre area, the largest swath of U.S. public land, which have been in place for more than four decades, my colleagues Juliet Eilperin and Steven Mufson report. Under the current plan, finalized in 2013, only half of the reserve is open to drilling.

The area is oil rich, holding as much as 8.7 billion barrels in undiscovered crude and 25 trillion cubic feet of natural gas, according to a recent U.S. Geological Survey analysis. But environmentalists and some Alaska

Natives, who hunt in the area, object to the expansion of oil and gas operations and probably will challenge the decision in court.

## A watchdog agency found that Trump's July 4 gala last year cost $13 million.

That total is twice as much as previous Independence Day celebrations, according to a new estimate from the Government Accountability Office. The report was requested by Senate Democrats.

"The report says the additional cost was driven by the expense of transporting several military vehicles to the Mall and the additional security needed for Trump, who attended the event," Fredrick Kunkle reports. "The president also delivered a 47-minute speech at the Lincoln Memorial, praising Americans' sacrifice and extolling U.S. military might. Abrams tanks and Bradley Fighting Vehicles were stationed on the Mall, while a B-2 bomber, F-22 fighter jets and other aircraft flew overhead."

On Trump's schedule for Independence Day weekend this year: a massive fireworks display at Mount Rushmore, ending a decade-long ban on pyrotechnics at the spot.

## The attorney general of the District of Columbia is suing four oil majors for allegedly misleading the public about climate change.

ExxonMobil, BP, Royal Dutch Shell and Chevron got slapped with the lawsuit from Attorney General Karl A. Racine on Thursday, Emily Davies reports.

Racine said the four firms violated the District's consumer protection law by painting a "false picture" of what their gasoline and other products were doing to heat the atmosphere. Representatives for Exxon, Shell and Chevron rejected the allegations, with Chevron calling the suit "meritless." BP declined to comment.

The District is just the latest entity to sue publicly-traded oil companies over climate change. And just on Wednesday, Minnesota Attorney General Keith Ellison made his state the first to file a climate lawsuit against the privately-held Koch Industries and the American Petroleum Institute, a major Washington-based lobbying group.

**Dino Grandoni**

Dino Grandoni is an energy and environmental policy reporter and the author of PowerPost's daily tipsheet on the beat, The Energy 202. Before The Post, he was the climate and energy reporter at BuzzFeed News, where he covered the intersection of science, industry and government.  Follow 🐦